MONICA Y. KIM (State Bar No. 180139)
DAVID B. GOLUBCHIK (State Bar No. 185520)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile:   (310) 229-1244
Email: myk@lnbyb.com; dbg@lnbyb.com

Attorneys for Todd A. Frealy,
Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>T3M INC., a Delaware corporation, f/k/a T3 MOTION, INC., a Delaware corporation,<br><br>             Debtor. | Case No. 6:17-bk-14082-SY<br><br>Chapter 7<br><br>**NOTICE OF MOTION AND MOTION TO USE PROPERTY OF THE ESTATE TO PRESERVE ESTATE'S INTEREST IN D&O INSURANCE POLICY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF TODD A. FREALY IN SUPPORT THEREOF**<br><br>Hearing:<br>Date:           January 11, 2018<br>Time:          9:30 a.m.<br>Location:    Courtroom "302"<br>                3420 Twelfth Street<br>                Riverside, California 92501 |

1    **PLEASE TAKE NOTICE** that a hearing will be held on January 11, 2018, at 9:30 a.m.

2    (the "Hearing"), before the Honorable Scott H. Yun, United States Bankruptcy Judge for the

3    Central District of California – Riverside Division, in Courtroom "302" located at 3420 Twelfth

4    Street, Riverside, California 92501, for the Court to consider the motion (the "Motion") filed by

5    Todd A. Frealy, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of T3M Inc., a

6    Delaware corporation, f/k/a T3 Motion, Inc., a Delaware corporation, and the debtor herein (the

7    "Debtor"), pursuant to 11 U.S.C. § 363(b), to utilize estate property to preserve the estate's

8    interest in the Debtor's D&O Insurance Policy (the "Policy").

9    In summary, prior to the appointment of the Trustee, the Debtor secured numerous

10    insurance policies in connection with its business operations. Among the policies was a policy

11    insuring director and officer liabilities, with a limit of $3,000,000. The premiums for the Policy

12    were financed through a Commercial Premium Finance Agreement (the "Agreement") with

13    First Insurance of California Funding (the "Lender"). The Trustee has learned that finance

14    payments to the Lender were not made for the months of September 2017 through December

15    2017. The total arrearages are $58,014.92. The Lender advised the Trustee that the Lender

16    intends to terminate the Policy for such nonpayment absent curing the arrears. The Trustee

17    reached out to the Lender and received confirmation that, provided that the arrears in the

18    amount of $58,014.92 are paid, that the Policy will not be terminated.

19    In connection with the secured creditor's motion to convert this case to Chapter 7, the

20    secured creditor provided certain information which indicates potential wrongdoing by the

21    Debtor's officers and directors. The Trustee is in the process of investigating the foregoing

22    allegations and other claims against the Debtor's directors and officers which, if successful,

23    could result in a substantial benefit to the estate and all creditors. However, the Policy must be

24    in effect to allow the Trustee to make appropriate claims on the Policy and pursue them for the

25    benefit of the estate and all creditors. Pursuant to a recently approved sale transaction, the

26    estate is in possession of $300,000. Net of certain costs and expenses, as approved by the

27    Court, the Trustee currently holds approximately $250,000. As a result, the Trustee holds

28    sufficient funds to cure the arrears of $58,014.92. The Trustee, exercising his business

2

1  judgment, believes that the utilization of such property of the estate to preserve the Policy is

2  necessary, appropriate and in the best interest of all creditors.

3      **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

4  1(f), any interested party that wishes to oppose the relief requested in the Motion must, not later

5  than fourteen (14) days prior to the scheduled hearing date set forth above, file with the Clerk of

6  the Bankruptcy Court and serve upon counsel for the Trustee (whose name and address are set

7  forth on the upper left-hand corner of the first page of this Notice) and the Office of the United

8  States Trustee, "[a] complete written statement of all reasons in opposition thereto ...,

9  declarations and copies of all photographs and documentary evidence on which the responding

10  party intends to rely, and any responding memorandum of points and authorities."

11      **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

12  1(h), the failure to file and serve a timely opposition to the Motion may be deemed by the Court

13  to constitute consent to the relief requested in the Motion.

14  Dated: December 21, 2017                 TODD A. FREALY, CHAPTER 7 TRUSTEE

15

16                                 By:   */s/ David B. Golubchik*
                                     MONICA Y. KIM

17                                       DAVID B. GOLUBCHIK
                                     LEVENE, NEALE, BENDER, YOO

18                                             & BRILL L.L.P.
                                   Attorneys for Chapter 7 Trustee

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF RELEVANT FACTS

1.      On May 15, 2017 ("Petition Date"), T3M, Inc., a Delaware corporation, f/k/a T3 Motion, Inc., a Delaware corporation, and the debtor herein (the "Debtor"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

2.      The Debtor operated as a debtor in possession until September 26, 2017, when the Court converted the Debtor's Chapter 11 bankruptcy case to a Chapter 7 bankruptcy case. Shortly thereafter, Todd A. Frealy was duly appointed to serve as the Chapter 7 trustee ("Trustee") of the Debtor's bankruptcy estate.

3.      According to the Debtor, the Debtor is a company that was founded in 2006 by Ki Nam and was in the business of designing, manufacturing, and marketing for sale personal mobility vehicles powered by electric motors, including electric stand-up vehicles designed for use by public and private security personnel.  Until its delisting in October 2013, the Debtor was a publicly traded company whose stock was traded on the NYSE MKT LLC exchange.  The ticker symbol for the Debtor was TTTM.

4.      Until the conversion of the Debtor's case to Chapter 7, the Debtor's manufacturing, sales and service operations were all done through its Chino, California facility.

5.      At the time of the conversion of its case, the Debtor had inventory, furniture, fixtures and equipment, accounts receivable, intellectual property, sole ownership of a subsidiary company located in China which allegedly operates the same business as the Debtor, and other miscellaneous assets.

6.      Prior to the appointment of the Trustee, the Debtor secured numerous insurance policies in connection with its business operations.  Among the policies was a policy insuring director and officer liabilities ("Policy"), a true and correct copy of which is attached as **Exhibit "A"** to the Declaration of Todd A. Frealy ("Frealy Declaration") annexed hereto.   The Policy limit is $3,000,000.

7.    An entity known as Lender Collections LLC ("LC"), which is purported to be related and/or controlled by an individual named William Tsumpes ("Tsumpes"), the former Chief Executive Officer ("CEO") and director of the Debtor, asserts a lien on all of the Debtor's assets to secure a claim filed by LC for a sum in excess of $5 million. The amount, scope and nature of LC's liens are disputed by the Debtor and by the Trustee. The Trustee and LC have now resolved their disputes relating to the asserted claim, among other things. The compromise between the Trustee and LC has been approved by the Court.

8.    In connection with LC's motion to convert this case to Chapter 7, LC provided certain information which indicates potential wrongdoing by the Debtor's officers and directors. In addition, the Trustee was informed by the Debtor's former accountant that material changes were made to Q4 2014 quarterly financial reports after they were prepared by the accountant. The Trustee was also informed and believes that the actions of certain officers and directors during the Chapter 11 phase of this case may not have been in the best interests of the Debtor and its estate. Investigation of such allegations has commenced and is ongoing.

9.    In connection with the Trustee's investigation into the affairs of the Debtor, including those discussed above, and his negotiations with LC, the Trustee believes that the estate may have claims against the Debtor's former directors and officers which, if successful, could result in a substantial benefit to the estate and all creditors ("D&O Claims"). LC asserted a lien on these D&O Claims, however, the Trustee strongly disagreed with such assertion. Ultimately, the parties agreed that any money recovered by the estate from the prosecution of any D&O Claims will be split 50/50 between the parties, net of any recovery costs including attorneys' fees. In addition, any remaining secured claim of LC in this case is secured only by LC's portion of the proceeds from the D&O Claims.

10.    In order to facilitate and maximize the estate's recovery from the D&O Claims, the Policy must be in effect to allow the Trustee to make appropriate claims on the Policy and pursue them for the benefit of the estate and all creditors.

11.    The premiums for the Policy were financed through a Commercial Premium Finance Agreement (the "Agreement"), a true and correct copy of which is attached as **Exhibit**

5

1   **"B"** to the Frealy Declaration, with First Insurance of California Funding (the "Lender").  The

2   Trustee has learned that finance payments to the Lender were not made for the months of

3   September 2017 through December 2017.  The total arrearages are $58,014.92.  The Lender

4   advised the Trustee that the Lender intends to terminate the Policy for such nonpayment absent

5   curing the arrears.  The Trustee reached out to the Lender and received confirmation that,

6   provided that the arrears in the amount of $58,014.92 are paid, that the Policy will not be

7   terminated.

8       12.    Pursuant to a recently approved sale transaction whereby the estate sold its

9   claims and causes of action against Tsumpes, Lei/Pei Lin Tsumpes, LC, Seaguard Technologies,

10  Seaguard Electronics, T-Energy and any known and unknown affiliates owned or controlled by

11  Tsumpes (the "Litigation Defendants") to Alfonso Cordero or his designee, the estate is in

12  possession of $300,000.  As a result, the Trustee holds sufficient funds to cure the arrears of

13  $58,014.92[1].

14      13.    The Trustee, exercising his business judgment, believes that the utilization of

15  such property of the estate to preserve the Policy is necessary, appropriate and in the best

16  interest of all creditors.

17                                          **II.**

18                                      **DISCUSSION**

19      Section 363(b) of the Bankruptcy Code provides that after notice and a hearing a trustee

20  may use property of the estate outside the ordinary course of business. 11 U.S.C. § 363(b). The

21  vast majority of cases interpreting this section involve sales of the property of the estate. In the

22  sale context, courts emphasis that the trustee's business judgment is to be afforded deference.

23  "Ordinarily, the position of the trustee is afforded deference, particularly where business

24  judgment is entailed in the analysis or where there is no objection." Simantob v. Claims

25  Prosecutor, L.L.C. (In re Lahijani), 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005). The bankruptcy

26

27  —————————————

28  [1] Net of certain costs and expenses, as approved by the Court, the Trustee currently holds
    approximately $250,000.

1  court reviews the trustee's business judgment only "to determine independently whether the

2  judgment is a reasonable one. The court should not substitute its judgment for the trustee's but

3  should determine only whether the trustee's judgment was reasonable and whether a sound

4  business justification exists supporting the sale and its terms." 3-363 Collier on Bankruptcy ¶

5  363.02[4].

6      Here, the Trustee believes that the Policy presents a significant asset for the estate.

7  While investigation is ongoing, the claims against the Debtor's officers and directors appear to

8  be the type that can be asserted against the Policy and could result in a substantial benefit to the

9  estate and all creditors.  Specifically, the Trustee is informed by the Debtor's former accountant

10  that material changes were made to Q4 2014 quarterly financial reports after they were prepared

11  by the accountant. In addition, the Trustee is informed and believes that the actions of certain

12  officers and directors during the Chapter 11 phase of this case may not have been in the best

13  interests of the Debtor and its estate. But for the Policy, which has a limit of $3 million, the

14  Trustee's sole targets of recovery would be individuals, collectability against whom is

15  uncertain.  In the interest of efficiency and maximum benefit to the estate, pursuing claims

16  against the Policy in addition to the affected directors and officers is preferred over pursuing

17  just the individuals with uncertain financials.  The Trustee believes that the benefit to the estate

18  of preserving the Policy is substantially greater than the arrears needed to be cured, in the

19  amount of $58,014.92.

20      In addition, the Trustee believes that the estate must recover substantial additional funds

21  from the D&O Claims and potential avoidance claims, if any, so that there will be sufficient

22  funds to make a distribution to not only Chapter 11 administrative claims, but also pre-petition

23  priority wage and tax claims, and potentially general unsecured claims. Notably, pre-petition

24  priority claims filed against the estate total approximately $2.5 million.

25      Based on the foregoing, exercising his business judgment, the Trustee submits that the

26  approval of the Motion and use of estate property to cure the arrears for the Policy is necessary,

27  proper and in the overwhelming best interest of the estate and all creditors.

28

## III.

## CONCLUSION

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

1.      finding that the notice given by the Trustee in connection with the Motion is adequate, sufficient, proper and complies with all applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

2.      granting the Motion in its entirety;

3.      authorizing the Trustee to utilize estate funds to pay the arrears on the Policy, in the amount of $58,014.92; and

4.      granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  December 21, 2017              TODD A. FREALY, CHAPTER 7 TRUSTEE


                                       By:_____*/s/ David B. Golubchik*_____
                                          MONICA Y. KIM
                                          DAVID B. GOLUBCHIK
                                          LEVENE, NEALE, BENDER, YOO
                                                  & BRILL L.L.P.
                                          Attorneys for Todd A. Frealy,
                                          Chapter 7 Trustee

## <u>DECLARATION OF TODD A. FREALY</u>

I, Todd A. Frealy, declare as follows:

1.      I am the duly-appointed, qualified, and acting Chapter 7 Trustee (the "<u>Trustee</u>") for the bankruptcy estate (the "<u>Estate</u>") of T3M Inc., a Delaware corporation, f/k/a T3 Motion, Inc., a Delaware corporation, and the debtor herein (the "<u>Debtor</u>").  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on May 15, 2017 ("<u>Petition Date</u>").

3.      The Debtor operated as a debtor in possession until September 26, 2017, when the Court converted the Debtor's Chapter 11 bankruptcy case to a Chapter 7 bankruptcy case. Shortly thereafter, I was duly appointed to serve as the Trustee of the Debtor's Estate.

4.      According to the Debtor, the Debtor is a company that was founded in 2006 by Ki Nam and was in the business of designing, manufacturing, and marketing for sale personal mobility vehicles powered by electric motors, including electric stand-up vehicles designed for use by public and private security personnel.  I am advised and believe that, until its delisting in October 2013, the Debtor was a publicly traded company whose stock was traded on the NYSE MKT LLC exchange.  The ticker symbol for the Debtor was TTTM.

5.      I am advised and believe that, until the conversion of the Debtor's case to Chapter 7, the Debtor's manufacturing, sales and service operations were all done through its Chino, California facility.

6.      I am further advised and believe that, at the time of the conversion of its case, the Debtor had inventory, furniture, fixtures and equipment, accounts receivable, intellectual property, sole ownership of a subsidiary company located in China which allegedly operates the same business as the Debtor, and other miscellaneous assets.

7.  Prior to my appointment as the Trustee, the Debtor secured numerous insurance policies in connection with its business operations.  Among the policies was a policy insuring director and officer liabilities ("<u>Policy</u>"), a true and correct copy of which is attached hereto as **Exhibit "A"**.

8.   An entity known as Lender Collections LLC ("LC"), which is purported to be related and/or controlled by an individual named William Tsumpes ("Tsumpes"), the former Chief Executive Officer ("CEO") and director of the Debtor, asserts a lien on all of the Debtor's assets to secure a claim filed by LC for a sum in excess of $5 million.  The amount, scope and nature of LC's liens are disputed by the Debtor and by me.  LC and I have now resolved our disputes relating to the asserted claim, among other things.  The compromise between LC and me has been approved by the Court.

9.   In connection with LC's motion to convert this case to Chapter 7, which I reviewed, LC provided certain information which indicates potential wrongdoing by the Debtor's officers and directors.  In addition, I was informed by the Debtor's former accountant that material changes were made to Q4 2014 quarterly financial reports after they were prepared by the accountant. I was also informed and believe that the actions of certain officers and directors during the Chapter 11 phase of this case may not have been in the best interests of the Debtor and its estate.  Investigation of such allegations has commenced and is ongoing.

10. In connection with my investigation into the affairs of the Debtor, including those asserted above, and my negotiations with LC, I believe that the estate may have claims against the Debtor's former directors and officers which, if successful, could result in a substantial benefit to the estate and all creditors ("D&O Claims").  LC asserted a lien on these D&O Claims, however, I strongly disagreed with such assertion.  Ultimately, the parties agreed that any money recovered by the estate from the prosecution of any D&O Claims will be split 50/50 between the parties, net of any recovery costs including attorneys' fees.  In addition, any remaining secured claim of LC in this case is secured only by LC's portion of the proceeds from the D&O Claims.

11. I believe that the Policy presents a significant asset for the estate.  While investigation is ongoing, the claims against the Debtor's officers and directors appear to be the type that can be asserted against the Policy and could result in a substantial benefit to the estate and all creditors.  Specifically, I am informed by the Debtor's former accountant that material changes were made to Q4 2014 quarterly financial reports after they were prepared by the

accountant. In addition, I am informed and believe that the actions of certain officers and directors during the Chapter 11 phase of this case may not have been in the best interests of the Debtor and its estate. But for the Policy, which has a limit of $3 million, my sole targets of recovery would be individuals, collectability against whom is uncertain. In the interest of efficiency and maximum benefit to the estate, pursuing claims against the Policy in addition to the affected directors and officers is preferred over pursuing just the individuals with uncertain financials. I believe that the benefit to the estate of preserving the Policy is substantially greater than the arrears needed to be cured, in the amount of $58,014.92.

12. In addition, I believe that the estate must recover substantial additional funds from the D&O Claims and potential avoidance claims, if any, so that there will be sufficient funds to make a distribution to not only Chapter 11 administrative claims, but also pre-petition priority wage and tax claims, and potentially general unsecured claims. Notably, pre-petition priority claims filed against the estate total approximately $2.5 million.

13. In order to facilitate and maximize the estate's recovery from the D&O Claims, the Policy must be in effect to allow me to make appropriate claims on the Policy and pursue them for the benefit of the estate and all creditors.

14. The premiums for the Policy were financed through a Commercial Premium Finance Agreement (the "Agreement"), a true and correct copy of which is attached hereto as **Exhibit "B"**, with First Insurance of California Funding (the "Lender"). I have learned that finance payments to the Lender were not made for the months of September 2017 through December 2017. The total arrearages are $58,014.92. The Lender advised me that the Lender intends to terminate the Policy for such nonpayment absent curing the arrears. I have reached out to the Lender and received confirmation that, provided that the arrears in the amount of $58,014.92 are paid, that the Policy will not be terminated.

15. Pursuant to a recently approved sale transaction whereby the estate sold its claims and causes of action against Tsumpes, Lei/Pei Lin Tsumpes, LC, Seaguard Technologies, Seaguard Electronics, T-Energy and any known and unknown affiliates owned or controlled by

1  Tsumpes (the "<u>Litigation Defendants</u>") to Alfonso Cordero or his designee, the estate is in

2  possession of $300,000. As a result, I hold sufficient funds to cure the arrears of $58,014.92[2].

3      16. Based on the foregoing, exercising my business judgment, I submit that the approval

4  of the Motion and use of estate property to cure the arrears for the Policy is necessary, proper

5  and in the overwhelming best interest of the estate and all creditors.

6      I declare and verify under penalty of perjury under the law of the United States of

7  America that the foregoing is true and correct to the best of my knowledge.

8      Executed on this 21st day of December, 2017, at Los Angeles, California.

9

10

11  _____

12              TODD A. FREALY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____

28  [2] Net of certain costs and expenses, as approved by the Court, the Trustee currently holds
approximately $250,000.

12

# EXHIBIT "A"

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

Executive Liability
175 Water Street
New York, NY 10038
http://www.aig.com



eDiscovery Solutions

Dear Insured:

Congratulations on purchasing your Executive Edge℠ policy from a member company of AIG Property Casualty Inc. (AIG), one of the premier writers of management liability insurance. Your policy offers many outstanding features, and as a AIG Insured you have the confidence of knowing that your claims will be handled by highly experienced claims professionals. In addition, our panel counsel is comprised of leading law firms throughout the country.

The purpose of this letter is to introduce you to eDiscovery Solutions, a value-added program providing e-discovery advantages to Executive Edge policyholders. The risks associated with not being prepared to handle requests to produce electronically stored information (ESI) are significant as companies are held accountable for missteps made along the way and the potential costs of e-discovery are exorbitant. eDiscovery Solutions provides Executive Edge policyholders with the advantage of assisting in the creation of an e-discovery plan before litigation commences and the development of a cost-effective strategy to address e-discovery when a claim does arise. As an Executive Edge policyholder, you have access to the following suite of optional eDiscovery Solutions benefits to minimize the risks and expense of e-discovery:

- Help in creating an effective e-discovery strategy before a claim arises.
  - 2.5 hour "boot camp" by Encore Discovery Solutions (an independent third party provider of e-discovery services) addressing the major components of e-discovery plus an additional 10 hours of expert e-discovery consultation with Encore to assess e-discovery readiness at no cost to insureds that remain on risk. These services are available at no cost to policyholders and favorable rates are available to those policyholders who wish to purchase additional services.

- Guidance and management through the process of responding to ESI requests.
  - Pre-approved independent experts assist in responding to requests to produce ESI through development of a cost-effective strategy.
  - Pre-approved independent consultants oversee the e-discovery process including assessment of information systems capabilities, locating and preserving relevant electronic data stores, vendor selection, defining scope of work and establishing metrics to evaluate and monitor efficient execution.
  - First $25,000 of consultants' fees covered with no retention and policyholders may choose to continue to benefit from the consultant's services at pre-negotiated favorable rates.

To take advantage of the services offered through eDiscovery Solutions, email ediscoverysolutions@AIG.com or contact your insurance broker or AIG underwriter.



**National Union Fire Insurance Company of Pittsburgh, Pa.®**
*A capital stock company*
(the "Insurer")

**POLICY NUMBER:** *01-277-10-42*                    **REPLACEMENT OF POLICY NUMBER:** *01-771-38-95*

# Executive Edge®

**Broad Form Management Liability Insurance Policy**

NOTICES: This policy provides claims-made coverage. Such coverage is generally limited to liability for (i) **Claims** first made against **Insureds**, (ii) **Inquiries** that an **Insured Person** first received, and (iii) **Crises** first occurring, in each case, during the **Policy Period** or, if applicable, the **Discovery Period**. Coverage under this policy is conditioned upon notice being timely provided to the **Insurer** as required (see the Notice and Reporting clause for details). Covered **Defense Costs**, **Pre-Claim Inquiry Costs** and **Derivative Investigation Costs** shall reduce the **Limits of Liability** available to pay judgments or settlements, and shall be applied against the retention amount. The **Insurer** does not assume any duty to defend. Please read this policy carefully and review its coverage with your insurance agent or broker.

## DECLARATIONS

1. **NAMED ENTITY:**        *T3 MOTION, INC.*

    **Named Entity Address:**    *5181 EDISON AVENUE*
    *CHINO, CA 91710*

    **State of Formation:**    *Delaware*

2. **POLICY PERIOD:**    From: *March 4, 2017*        To: *March 4, 2018*
    The **Policy Period** incepts and expires as of 12:01 A.M. at the **Named Entity Address**.

3. **PREMIUM:**                                                *$165,222*

4. **LIMIT OF LIABILITY:**                                    *$3,000,000*

5. **RETENTION:** Not applicable to: (i) **Non-Indemnifiable Loss**, (ii) **Crisis Loss** or
    (iii) **Derivative Investigation Costs**.

    (a) **Securities Retention:**                            *$500,000*

    (b) **Employment Practices Retention:**                  *$250,000*

    (c) All other **Loss** to which a Retention applies :    *$250,000*

    If the **Organizations** fail or refuse to satisfy an applicable Retention, this policy shall advance the **Loss** of an **Insured Person** pursuant to the ADVANCEMENT Clause.

6. **PASSPORT:**    This policy ☐serves, or ☒does not serve, as a master Passport policy.

*1582803*

Ⓒ All rights reserved.

**DECLARATIONS** (Continued)

AIG

7.    **INSURER**

(a) **INSURER ADDRESS**:    *175 Water Street*
                                              *New York, NY 10038-4969*

(b) **CLAIMS ADDRESS**:    By E-Mail: c-claim@AIG.com
                                           By Mail:  *AIG, Financial Lines Claims*
                                                          *P.O. Box 25947*
                                                          *Shawnee Mission, KS 66225*

    In either case, reference the Policy Number.

8.    **CONTINUITY DATES**

(a) **Outside Entity Executive** Coverage--The date on which the **Executive** first served
       as an **Outside Entity Executive** of such **Outside Entity**.

(b) All other coverage:    *November 17, 2014*

9.    **TRIA PREMIUM, TAXES AND SURCHARGES**

(a) **TRIA Premium**    *$822*

'**TRIA Premium**' means the premium for Certified Acts of Terrorism Coverage under Terrorism Risk
Insurance Act, as amended.  Amount indicated above is included in  **Premium.** A copy of the TRIA
disclosure sent with the original quote is attached hereto.

---

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President,
Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the
time of issuance by an authorized representative of the insurer.

_____      _____      _____
PRESIDENT                              AUTHORIZED REPRESENTATIVE            SECRETARY

*HUB INTERNATIONAL INSURANCE SERVICES INC.*
*1903 WRIGHT PLACE*
*SUITE 280*
*CARLSBAD, CA 92008*
   *1582803*

104122 (4/10)                                    2                    ⊕ All rights reserved.

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (RIGHT TO PURCHASE COVERAGE)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury-in consultation with the Secretary of Homeland Security, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING JANUARY 1, 2018; 81% BEGINNING JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

### COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *T3 MOTION, INC.*


Policy Number: *01-277-10-42*
Policy Period Effective Date From: *March 4, 2017*          To: *March 4, 2018*

© 2015 National Association of Insurance Commissioner

96555 (1/15)



# Executive Edge®
## BROAD FORM MANAGEMENT LIABILITY INSURANCE POLICY

| | | |
|---|---|---|
| **1. INSURING AGREEMENTS** | | 1 |
| A. | Insured Person Coverage | 1 |
| B. | Indemnification Of Insured Person Coverage | 1 |
| C. | Organization Coverage | 1 |
| D. | Crisisfund® Coverage | 1 |
| **2. EXTENSIONS** | | 2 |
| A. | Executive Protection Suite | 2 |
| B. | First Dollar E-Discovery Consultant Services | 2 |
| C. | Worldwide & Cross-Border | 2 |
| **3. PROTECTIONS WHEN INDEMNIFICATION IS UNAVAILABLE** | | 3 |
| A. | Advancement | 3 |
| B. | Order of Payments | 3 |
| C. | Bankruptcy And Insolvency | 3 |
| **4. EXCLUSIONS** | | 4 |
| **5. RETENTION** | | 5 |
| **6. LIMITS OF LIABILITY** | | 6 |
| **7. NOTICE AND REPORTING** | | 6 |
| **8. DISCOVERY** | | 8 |
| **9. DEFENSE AND SETTLEMENT** | | 9 |
| A. | For Claims And Pre-Claim Inquiries | 9 |
| B. | Pre-Authorized Securities Defense Attorneys | 10 |
| C. | Pre-Approved E-Consultant Firms | 10 |
| D. | Allocation | 10 |
| **10. CHANGES TO INSUREDS** | | 10 |
| A. | Transactions | 11 |
| B. | Subsidiary Additions | 11 |
| C. | Former Subsidiaries | 11 |
| D. | Scope of Subsidiary Coverage | 11 |
| **11. APPLICATION AND UNDERWRITING** | | 12 |
| A. | Application And Reliance | 12 |
| B. | Renewal Application Procedure | 12 |
| C. | Insured Person Coverage Non-Rescindable | 12 |
| D. | Severability Of The Application | 12 |
| **12. GENERAL TERMS AND CONDITIONS** | | 13 |
| A. | Payments And Obligations Of Organizations And Others | 13 |
| B. | Cancellation | 14 |
| C. | Notice And Authority | 14 |
| D. | Currency | 14 |
| E. | Assignment | 14 |
| F. | Disputes | 14 |
| G. | Spousal, Domestic Partner And Legal Representative Extension | 15 |
| H. | Conformance To Law | 16 |
| I. | Headings | 16 |
| **13. DEFINITIONS** | | 17 |

104123 (04/10)

© All rights reserved.

Executive Edge



In consideration of the payment of the premium, and each of their respective rights and obligations in this policy, the **Insureds** and the **Insurer** agree as follows:

# 1. INSURING AGREEMENTS

All coverage granted for **Loss** under this policy is provided solely with respect to:  (i) **Claims** first made against an **Insured**, (ii) **Pre-Claim Inquiries** first received by an **Insured Person**, and (iii) **Crises** first occurring, in each such event, during the **Policy Period** or any applicable **Discovery Period** and reported to the **Insurer** as required by this policy. Subject to the foregoing and the other terms, conditions and limitations of this policy, this policy affords the following coverage:

## A. *Insured Person Coverage*

This policy shall pay the **Loss** of any **Insured Person** that no **Organization** has indemnified or paid, and that arises from any:

**(1)** **Claim** (including any **Insured Person Investigation**) made against such **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**; or

**(2)** **Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**.

## B. *Indemnification Of Insured Person Coverage*

This policy shall pay the **Loss** of an **Organization** that arises from any:

**(1)** **Claim** (including any **Insured Person Investigation**) made against any **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**; and

**(2)** **Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**;

but only to the extent that such **Organization** has indemnified such **Loss** of, or paid such **Loss** on behalf of, the **Insured Person**.

## C. *Organization Coverage*

This policy shall pay the **Loss** of any **Organization**:

**(1)** arising from any **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**;

**(2)** incurred as **Derivative Investigation Costs**, subject to a $250,000 aggregate sublimit of liability; or

**(3)** incurred by an **Organization** or on its behalf by any **Executives** of the **Organization** (including through any special committee) as **Defense Costs** in seeking the dismissal of any **Derivative Suit** against an **Insured**.

## D. *Crisisfund® Coverage*

This policy shall pay the **Crisis Loss** of an **Organization**, up to the $100,000 **CrisisFund®**; provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

© All rights reserved.

Executive Edge

AIG

## 2. EXTENSIONS

### A. Executive Protection Suite

**Loss** shall also mean the following items, provided that they arise out of a **Claim**:

**(1) SOX 304 Costs**;

**(2) Extradition Costs**;

**(3) UK Corporate Manslaughter Act Defense Costs**;

**(4) Personal Reputation Expenses**, subject to a $100,000 per **Executive** and a $500,000 aggregate sublimit of liability; and

**(5) Asset Protection Costs**, subject to a $50,000 per **Executive** and a $250,000 aggregate sublimit of liability.

### B. First Dollar E-Discovery Consultant Services

For any **Securities Claim**, no Retention shall apply to the first $25,000 in **Defense Costs** incurred as **E-Discovery Consultant Services**.

### C. Worldwide & Cross-Border

| | |
|---|---|
| *Worldwide Territory* | The coverage afforded by this policy shall apply anywhere in the world. |
| *Global Liberalization* | For **Loss** from that portion of any **Claim** maintained in a **Foreign Jurisdiction** or to which the law of a **Foreign Jurisdiction** is applied, the **Insurer** shall apply the terms and conditions of this policy as amended to include those of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to **Insureds** in the **Foreign Jurisdiction**. This *Global Liberalization Clause* shall not apply to any provision of any policy that has worldwide effect, including but not limited to any provision addressing limits of liability (primary, excess or sublimits), retentions, other insurance, non-renewal, duty to defend, defense within or without limits, taxes, conformance to law or excess liability coverage, any claims made provisions, and any endorsement to this policy that excludes or limits coverage for specific events or litigation or that specifically states that it will have worldwide effect. |
| *Passport Master Policy Program* | If the Passport option box has been checked on the Declarations, then this policy shall act as a master policy and the coverage afforded by this policy shall be provided in conjunction with the Passport foreign underlyer policy issued in each jurisdiction selected by the **Named Entity**. The specific structure of the coverage provided by this master policy in conjunction with each Passport foreign underlyer policy is set forth in the Passport Structure Appendix attached to this policy. |

2
© All rights reserved.

Executive Edge



## 3. PROTECTIONS WHEN INDEMNIFICATION IS UNAVAILABLE

### A. Advancement

If for any reason (including but not limited to insolvency) an **Organization** fails or refuses to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Insured Person** until either (i) an **Organization** has agreed to make such payments, or (ii) the Retention has been satisfied. In no event shall any such advancement by the **Insurer** relieve any **Organization** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**.

Advancement, payment or indemnification of an **Insured Person** by an **Organization** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Organization** within 60 days of such request; and advancement, payment or indemnification by an **Organization** is deemed "refused" if an **Organization** gives a written notice of the refusal to the **Insured Person**. Advancement, payment or indemnification of an **Insured Person** by an **Organization** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from an **Organization**. Any payment or advancement by the **Insurer** within an applicable Retention shall apply towards the exhaustion of the **Limits of Liability**.

### B. Order Of Payments

In the event of **Loss** arising from a covered **Claim(s)** and/or **Pre-Claim Inquiry(ies)** for which payment is due under the provisions of this policy, the **Insurer** shall in all events:

(1)  First, pay all **Loss** covered under Insuring Agreement A. *Insured Person Coverage*;

(2)  Second, only after payment of **Loss** has been made pursuant to subparagraph (1) above and to the extent that any amount of the **Limit of Liability** shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement B. *Indemnification Of Insured Person Coverage*; and

(3)  Lastly, only after payment of **Loss** has been made pursuant to subparagraphs (1) and (2) above and to the extent that any amount of the **Limit of Liability** shall remain available, at the written request of the chief executive officer of the **Named Entity**, either pay or withhold payment of **Loss** covered under Insuring Agreement C. *Organization Coverage* and Insuring Agreement D. *Crisisfund® Coverage*.

In the event the **Insurer** withholds payment pursuant to subparagraphs (2) and/or (3) above, then the **Insurer** shall, at such time and in such manner as shall be set forth in instructions of the chief executive officer of the **Named Entity**, remit such payment to an **Organization** or directly to or on behalf of an **Insured Person**.

### C. Bankruptcy And Insolvency

Bankruptcy or insolvency of any **Organization** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations under this policy.

In such event, the **Insurer** and each **Organization** and **Insured Person** agree to cooperate in any efforts by the **Insurer** or any **Organization** or **Insured Person** to obtain relief for the benefit of the **Insured Persons** from any stay or injunction applicable to the distribution of the policy proceeds.

104123 (04/10)                                       3                          © All rights reserved.

Executive Edge 

## 4. EXCLUSIONS

### A. *Full Severability Of Exclusions For Insured Persons*

In determining whether any of the following Exclusions apply, the **Wrongful Acts** of any **Insured Person** shall not be imputed to any other **Insured**. For Insuring Agreement C. *Organization Coverage*, only the **Wrongful Acts** of any chief executive officer, chief financial officer or general counsel (or equivalent position) of an **Organization** shall be imputed to such **Organization**.

### B. *Exclusions*

The **Insurer** shall not be liable to make any payment for **Loss**, other than **Crisis Loss**, in connection with any **Claim** made against an **Insured**:

| | | |
|---|---|---|
| (1) | *Conduct* | arising out of, based upon or attributable to any: |

    (a) remuneration, profit or other advantage to which the **Insured** was not legally entitled; or

    (b) deliberate criminal or deliberate fraudulent act by the **Insured**;

if established by any final, non-appealable adjudication in any action or proceeding other than an action or proceeding initiated by the **Insurer** to determine coverage under the policy;

provided, however:

    (i) Conduct Exclusion (a), above, shall not apply in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations; and

    (ii) with respect to Conduct Exclusion (b), for acts or omissions which are treated as a criminal violation in a **Foreign Jurisdiction** that are not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act occurred;

| | | |
|---|---|---|
| (2) | *Pending & Prior Litigation* | alleging, arising out of, based upon or attributable to, as of the **Continuity Date**, any pending or prior: (a) litigation; or (b) administrative or regulatory proceeding or investigation of which any **Insured** had notice; or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation; |
| (3) | *Personal Injury* | for emotional distress or mental anguish of any person, or for injury from libel, slander, defamation or disparagement, or a violation of a person's right of privacy; provided, however, this exclusion shall not apply to an **Employment Practices Claim** or a **Securities Claim**; |
| (4) | *Bodily Injury & Property Damage* | for bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, this exclusion shall not apply to **UK Corporate Manslaughter Act Defense Costs** or a **Securities Claim**; |

© All rights reserved.

Executive Edge



**B.** *Exclusions* (Continued)

(5) *Entity v. Insured*    that is brought by or on behalf of any **Organization** against any **Insured**, or by any **Outside Entity** against any **Outside Entity Executive**; provided, however, this exclusion shall not apply:

(a) to any **Defense Costs** which constitute **Non-Indemnifiable Loss** incurred by any **Insured Person** in defending any **Claim** against that **Insured Person**;

(b) to any **Derivative Suit** not brought, controlled or materially assisted by any **Organization**, any **Outside Entity** or any **Executive** of the foregoing; or

(c) if the **Organization** or **Outside Entity** is the subject of a bankruptcy case (or the equivalent in a **Foreign Jurisdiction**), unless the **Claim** is brought, controlled or materially assisted by any **Organization** or **Outside Entity**, the resulting debtor-in-possession (or foreign equivalent) of the debtor **Organization** or **Outside Entity** or any **Executive** of the foregoing;

(6) *ERISA*    for any violation of responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any similar provisions of any state, local or foreign statutory or common law; or

(7) *Compensation & Labor Liability*    for any violation of responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification (WARN) Act, the Consolidated Omnibus Budget Reconciliation Act (COBRA), the Occupational Safety and Health Act (OSHA), or any federal, state, local or foreign law, amendment to a law, or any rule or regulation, that imposes or expands responsibilities, obligations or duties relating to compensation, retirement, benefits, deductions, withholdings, breaks or the workplace; provided, however, this exclusion shall not apply to the extent that a **Claim** is for discrimination, sexual or other harassment, wrongful termination or hostile work environment, or for **Retaliation**, or to the extent that a **Claim** is a **Securities Claim**.

## 5. RETENTION

No Retention is applicable to the following: (i) **Non-Indemnifiable Loss**; (ii) **Derivative Investigation Costs**; or (iii) **Crisis Loss**.

Except as provided above and in the *First Dollar E-Discovery Consultant Services Extension*, for each **Claim** or **Pre-Claim Inquiry**, the **Insurer** shall only be liable for the amount of covered **Loss** arising from such **Claim** or **Pre-Claim Inquiry** which is in excess of the applicable Retention set forth on the Declarations or in any endorsement to this policy. Amounts within the Retention shall remain uninsured.

A single Retention shall apply to **Loss** arising from all **Related Claims** and all **Related Pre-Claim Inquiries**. In the event a **Claim** or **Pre-Claim Inquiry** triggers more than one Retention, then, as to such **Claim** or **Pre-Claim Inquiry**, the highest of such Retentions shall be deemed the Retention applicable to **Loss** arising from such **Claim** or **Pre-Claim Inquiry** unless this policy expressly provides otherwise.

104123 (04/10)    5    © All rights reserved.

Executive Edge



## 6. LIMITS OF LIABILITY

The **Limit of Liability** stated in the Declarations is the aggregate limit of the **Insurer's** liability for all **Loss** (including **Defense Costs** and **Pre-Claim Inquiry Costs**) under this policy. The **Limit of Liability** and all sublimits of liability are collectively referred to in this policy as the "**Limits of Liability**."

Each aggregate sublimit of liability in this policy is the maximum limit of the **Insurer's** liability for all **Loss** under this policy that is subject to that aggregate sublimit of liability. Each per **Executive** sublimit of liability in this policy is the maximum limit of the **Insurer's** liability for all **Loss** of each **Executive** under this policy that is subject to that per **Executive** sublimit of liability. All sublimits of liability shall be part of, and not in addition to, the **Limit of Liability**. Each per **Executive** sublimit of liability shall be part of, and not in addition to, its corresponding aggregate sublimit of liability.

The **Limits of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Limits of Liability** for the **Policy Period**. Further, all **Related Claims** and all **Related Pre-Claim Inquiries** that are considered made or received during the **Policy Period** or **Discovery Period** pursuant to subparagraph (b) or (c) of Clause 7. *Notice And Reporting*, shall also be subject to the applicable **Limits of Liability** set forth in this policy.

**Defense Costs** are not payable by the **Insurer** in addition to the **Limits of Liability**. **Defense Costs** are part of **Loss** and as such are subject to the **Limits of Liability** for **Loss**.

## 7. NOTICE AND REPORTING

Notice hereunder shall be given in writing to the **Insurer** at the **Claims Address** indicated in the Declarations. If mailed or transmitted by electronic mail, the date of such mailing or transmission shall constitute the date that such notice was given and proof of mailing or transmission shall be sufficient proof of notice.

(a)  *Reporting a Claim, Pre-Claim Inquiry or Crisis*

An **Organization** or an **Insured** shall, as a condition precedent to the obligations of the **Insurer** under this policy:

(1) notify the **Insurer** in writing of a **Claim** made against an **Insured** or a **Crisis**; or

(2) if an **Insured** elects to seek coverage for **Pre-Claim Inquiry Costs** in connection with any **Pre-Claim Inquiry**, notify the **Insurer** in writing of that **Pre-Claim Inquiry**;

as soon as practicable after (i) the **Named Entity's** Risk Manager or General Counsel (or equivalent position) first becomes aware of the **Claim** or **Pre-Claim Inquiry**; or (ii) the **Crisis** commences. In all such events, notification must be provided no later than 60 days after the end of the **Policy Period** or the **Discovery Period** (if applicable).

℗ All rights reserved.

Executive Edge    **AIG**

(b)  *Relation Back to the First Reported Claim or Pre-Claim Inquiry*

Solely for the purpose of establishing whether any subsequent **Related Claim** was first made or a **Related Pre-Claim Inquiry** was first received during the **Policy Period** or **Discovery Period** (if applicable), if during any such period:

(1) a **Claim** was first made and reported in accordance with Clause 7(a) above, then any **Related Claim** that is subsequently made against an **Insured** and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time that such previously reported **Claim** was first made; and

(2) a **Pre-Claim Inquiry** was actually first received by an **Insured Person** and reported in accordance with Clause 7(a) above, then:

  (i)  any **Related Pre-Claim Inquiry** that is reported in accordance with Clause 7(a) above shall be deemed to be a **Pre-Claim Inquiry** first received at the time that such previously reported **Pre-Claim Inquiry** was first received by an **Insured Person**; and

  (ii) any subsequent **Related Claim** that is reported in accordance with Clause 7(a) above shall be deemed to be a **Claim** first made at the time that such previously reported **Pre-Claim Inquiry** was first received by an **Insured Person**.

With respect to any subsequent **Related Pre-Claim Inquiry**, this policy shall not cover **Loss** incurred before such subsequent **Related Pre-Claim Inquiry** is actually received by an **Insured Person**, and with respect to any subsequent **Related Claim**, this policy shall not cover **Loss** incurred before such subsequent **Related Claim** is actually made against an **Insured**. **Claims** actually first made or deemed first made prior to the inception date of this policy, **Pre-Claim Inquiries** first received or deemed first received by an **Insured Person** prior to the inception date of this policy, and **Claims** or **Pre-Claim Inquiries** arising out of any circumstances of which notice has been given under any directors and officers liability insurance policy in force prior to the inception date of this policy, are not covered under this policy.

(c)  *Relation Back to Reported Circumstances Which May Give Rise to a Claim*

If during the **Policy Period** or **Discovery Period** (if applicable) an **Organization** or an **Insured Person** becomes aware of and notifies the **Insurer** in writing of circumstances that may give rise to a **Claim** being made against an **Insured** and provides details as required below, then any **Claim** that is subsequently made against an **Insured** that arises from such circumstances and that is reported in accordance with Clause 7(a) above shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period** or during the **Discovery Period** (if applicable). Coverage for **Loss** arising from any such subsequent **Claim** shall only apply to **Loss** incurred after that subsequent **Claim** is actually made against an **Insured**. In order to be effective, notification of circumstances must specify the facts, circumstances, nature of the alleged **Wrongful Act** anticipated and reasons for anticipating such **Claim**, with full particulars as to dates, persons and entities involved; however, notification that includes a copy of an agreement to toll a statute of limitations shall be presumed sufficiently specific as to the potential **Claims** described within that agreement.

© All rights reserved.

Executive Edge

AIG

## 8. DISCOVERY

*Bilateral Discovery Options*

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew or replace this policy, the **Insureds** shall have the right to a period of one to six years following the effective date of such cancellation or nonrenewal (the "**Discovery Period**"), upon payment of the respective "**Additional Premium Amount**" described below, in which to give to the **Insurer** written notice pursuant to Clause 7(a) and Clause 7(c) of the policy of: (i) **Claims** first made against an **Insured**; (ii) **Pre-Claim Inquiries** first received by an **Insured Person**; and (iii) circumstances of which an **Organization** or an **Insured** shall become aware, in any such case, during said **Discovery Period** and solely with respect to a **Wrongful Act** that occurs prior to the end of the **Policy Period**.

*Discovery Premium*

The **Additional Premium Amount** for: (a) one year shall be no more than 125% of the **Full Annual Premium**; (b) two to six years shall be an amount to be determined by the **Insurer**. As used herein, "**Full Annual Premium**" means the premium level in effect immediately prior to the end of the **Policy Period**.

*Transaction Option*

In the event of a **Transaction**, the **Named Entity** shall have the right to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**). The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions, exclusions and additional premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancelable and the additional premium charged is non-refundable in whole or in part. This *Discovery Clause* shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this *Discovery Clause* shall terminate unless written notice by any **Insured** of election of a **Discovery Period**, together with the additional premium due, is received by the **Insurer** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **Transaction**.

© All rights reserved.

Executive Edge



## 9.  DEFENSE AND SETTLEMENT

### A. For Claims And Pre-Claim Inquiries

**(1)** *No Duty to Defend or Investigate*

The **Insureds** shall defend and contest any **Claim** made against them. The **Insurer** does not assume any duty to defend or investigate.

**(2)** *Advancement*

Once the **Insurer** has received written notice of a **Claim** or **Pre-Claim Inquiry** under this policy, it shall advance, excess of any applicable Retention, covered **Defense Costs** or **Pre-Claim Inquiry Costs**, respectively, on a current basis, but no later than 90 days after the **Insurer** has received itemized bills for those **Defense Costs** or **Pre-Claim Inquiry Costs**. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured Person** or **Organization**, severally according to their respective interests, in the event and to the extent that any such **Insured Person** or **Organization** shall not be entitled under this policy to payment of such **Loss**.

**(3)** *Claims Participation and Cooperation*

The **Insurer** shall have the right, but not the obligation, to fully and effectively associate with each and every **Organization** and **Insured Person** in the defense and prosecution of any **Claim** or **Pre-Claim Inquiry** that involves, or appears reasonably likely to involve the **Insurer**, including, but not limited to, negotiating a settlement. Each and every **Organization** and **Insured Person** shall give the **Insurer** full cooperation and such information as it may reasonably require.

The failure of any **Insured Person** to give the **Insurer** cooperation and information as required in the preceding paragraph shall not impair the rights of any other **Insured Person** under this policy.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any **Defense Costs** or **Pre-Claim Inquiry Costs**, without the prior written consent of the **Insurer**.  Such consent shall not be unreasonably withheld.

**(4)** *Full Settlement Within Retention/ Consent Waived*

If all **Insured** defendants are able to dispose of all **Claims** and/or **Pre-Claim Inquiries** which are subject to one Retention (inclusive of **Defense Costs**) for an amount not exceeding the Retention, then the **Insurer's** consent shall not be required for such disposition.

**(5)** *Applicability*

This *Defense and Settlement Clause* is not applicable to **Crisis Loss** or **Personal Reputation Expenses**. Nevertheless the **Insurer** does not, under this policy, assume any duty to defend.

                                    ℗ All rights reserved.

Executive Edge                                                                    AIG

### B. Pre-Authorized Securities Defense Attorneys

The list of approved panel counsel law firms ("**Panel Counsel**") is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "Directors & Officers (Securities Claims)" link. The list provides the **Insureds** with a choice of law firms from which a selection of legal counsel shall be made to conduct the defense of any **Securities Claim** made against such **Insureds**. With the express prior written consent of the **Insurer**, an **Insured** may select a **Panel Counsel** different from that selected by another **Insured** defendant if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable. The list of **Panel Counsel** may be amended from time to time by the **Insurer**. However, if a firm is removed from the list during the **Policy Period**, the **Insureds** shall be entitled to select such firm to conduct the defense of any **Securities Claim** made against such **Insureds** during the **Policy Period**.

The **Insureds** shall select a **Panel Counsel** to defend the **Securities Claim** made against the **Insureds** in the jurisdiction in which the **Securities Claim** is brought. In the event the **Claim** is brought in a jurisdiction not included on the list, the **Insureds** shall select a **Panel Counsel** in the listed jurisdiction which is the nearest geographic jurisdiction to either where the **Securities Claim** is brought or where the corporate headquarters of the **Named Entity** is located. In such instance the **Insureds** also may, with the express prior written consent of the **Insurer**, which consent shall not be unreasonably withheld, select a non-**Panel Counsel** in the jurisdiction in which the **Securities Claim** is brought to function as "local counsel" on the **Claim** to assist the **Panel Counsel** which will function as "lead counsel" in conducting the defense of the **Securities Claim**. This *Pre-Authorized Securities Defense Attorneys Clause* does not apply to **Defense Costs** solely relating to **Extradition** even if the underlying **Wrongful Acts** relate to a **Securities Claim**.

### C. Pre-Approved E-Consultant Firms

The list of pre-approved e-discovery consulting firms ("**E-Consultant Firms**") is accessible through the online directory at http://www.aig.com/us/panelcounseldirectory under the "e-Consultant Panel Members" link. The list provides the **Insureds** with a choice of firms from which a selection of an **E-Consultant Firm** shall be made. Any **E-Consultant Firm** may be hired by an **Insured** to perform **E-Discovery Consultant Services** without further approval by the **Insurer**.

### D. Allocation

An **Organization** is covered, subject to the policy's terms, conditions and limitations, only with respect to: (1) its indemnification of its **Insured Persons** as respects a **Claim** against or **Pre-Claim Inquiry** received by such **Insured Persons**; (2) a **Securities Claim** against such **Organization**; (3) **Crisis Loss**; and (4) **Derivative Investigation Costs**. Accordingly, the **Insurer** has no obligation under this policy for defense or other costs incurred by, judgments against or settlements by an **Organization** arising out of a **Claim** made against an **Organization** except as respects coverage for a **Securities Claim**, or any obligation to pay loss arising out of any legal liability that an **Organization** has to a claimant, except as respects a covered **Securities Claim** against such **Organization**.

With respect to: (i) **Defense Costs** jointly incurred by; (ii) any joint settlement entered into by; and/or (iii) any judgment of joint and several liability against any **Organization** and any **Insured Person** in connection with any **Claim** other than a **Securities Claim**, such **Organization** and such **Insured Person** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of the amounts as between such **Organization**, such **Insured Person** and the **Insurer**, taking into account the relative legal and financial exposures, and the relative benefits obtained by such **Insured Person** and such **Organization**. In the event that a determination as to the amount of **Defense Costs** to be advanced under this policy cannot be agreed to, then the

                    ◎ All rights reserved.

Executive Edge



**Insurer** shall advance **Defense Costs** excess of any applicable Retention which the **Insurer** states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

## 10.   CHANGES TO INSUREDS

### A. Transactions

In the event of a **Transaction** during the **Policy Period**, this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any **Wrongful Act** alleged to have occurred after the effective time of the **Transaction**. This policy may not be canceled after the effective time of the **Transaction** and no portion of the premium paid for this policy shall be refundable. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in the *Transaction Option* paragraph of Clause 8. *Discovery*.

### B. Subsidiary Additions

In addition to the definition of **"Subsidiary"** set forth in Clause 13. *Definitions*, **Subsidiary** also means any for-profit entity: (i) that is not formed as a partnership, (ii) of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and (iii) whose assets amount to:

(1) less than 25% of the total consolidated assets of each and every **Organization** as reported in the **Named Entity's** most recent public filing; or

(2) 25% or more of those total consolidated assets, but such entity shall be a **"Subsidiary"** only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, whichever expires or ends first (the **"Auto-Subsidiary Period"**);

provided that, with respect only to entities described in subparagraph (2) above, the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**.

The **Insurer** shall extend coverage for any **Subsidiary** described in subparagraph (2) above, and any **Insured Person** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy required by the **Insurer** relating to such **Subsidiary**. Further, coverage as shall be afforded to any **Subsidiary** and any **Insured Person** thereof is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to such **Subsidiary**.

### C. Former Subsidiaries

In the event the **Named Entity** loses **Management Control** of a **Subsidiary** during or prior to the **Policy Period**, coverage with respect to such **Subsidiary** and its **Insured Persons** shall continue until termination of this policy but only with respect to **Claims** for **Wrongful Acts** that occurred or are alleged to have occurred during the time that the **Named Entity** had **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**.

### D. Scope Of Subsidiary Coverage

Coverage as is afforded under this policy with respect to a **Claim** made against any **Subsidiary** and/or any **Insured Person** thereof shall only apply for **Wrongful Acts** committed or allegedly committed during the time that such **Subsidiary** and such **Insured Person** meet the respective definitions of **Subsidiary** and **Insured Person** set forth in this policy.

104123 (04/10)                                    11                        © All rights reserved.

Executive Edge 

## 11.  APPLICATION AND UNDERWRITING

### A. Application And Reliance

The **Insurer** has relied upon the accuracy and completeness of the statements, warranties and representations contained in the **Application**. All such statements, warranties and representations are the basis for this policy and are to be considered as incorporated into this policy.

### B. Renewal Application Procedure

A written renewal application form is not required in order to receive a renewal quote from the **Insurer**, although the **Insurer** reserves the right to require specific information upon renewal.

### C. Insured Person Coverage Non-Rescindable

Under no circumstances shall the coverage provided by this policy for **Loss** under Insuring Agreement A. *Insured Person Coverage* be deemed void, whether by rescission or otherwise, once the premium has been paid.

### D. Severability Of The Application

The **Application** shall be construed as a separate application for coverage by each **Insured Person**. With respect to the **Application**, no knowledge possessed by any **Organization** or any **Insured Person** shall be imputed to any other **Insured Person**.

If the statements, warranties and representations in the **Application** were not accurate and complete and materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the **Insurer** shall have the right to void coverage under this policy, *ab initio*, with respect to:

(1) **Loss** under Insuring Agreement B. *Indemnification Of Insured Person Coverage* for the indemnification of any **Insured Person** who knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed; and

(2) **Loss** under Insuring Agreement C. *Organization Coverage* if any **Insured Person** who is or was a chief executive officer or chief financial officer of the **Named Entity** knew, as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed.

The foregoing applies even if the **Insured Person** did not know that such incomplete or inaccurate disclosure had been provided to the **Insurer** or included within the **Application**.

&copy; All rights reserved.

Executive Edge



## 12.   GENERAL TERMS AND CONDITIONS

### A. *Payments And Obligations Of Organizations And Others*

#### 1.   *INDEMNIFICATION BY ORGANIZATIONS*

The **Organizations** agree to indemnify the **Insured Persons** and/or advance **Defense Costs** to the fullest extent permitted by law. If the **Insurer** pays under this policy any indemnification or advancement owed to any **Insured Person** by any **Organization** within an applicable Retention, then that **Organization** shall reimburse the **Insurer** for such amounts and such amounts shall become immediately due and payable as a direct obligation of the **Organization** to the **Insurer**. The failure of an **Organization** to perform any of its obligations to indemnify the **Insured Persons** and/or advance **Defense Costs** under this policy shall not impair the rights of any **Insured Person** under this policy.

#### 2.   *OTHER INSURANCE AND INDEMNIFICATION*

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible directors and officers liability insurance, unless such other insurance is specifically written as excess insurance over the **Limit of Liability** provided by this policy. This policy shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**. Such insurance as is provided by this policy shall apply as primary to any personal "umbrella" excess liability insurance purchased by an **Insured Person**.

With respect to **Employment Practices Claims**, such insurance as is provided by this policy shall apply only as excess of any other valid and collectible employment practices liability insurance, unless such other insurance is specifically written as excess insurance over the **Limit of Liability** provided by this policy. If according to the terms and conditions of any employment practices liability insurance policy providing coverage for an **Employment Practices Claim** made against an **Insured**, an insurer issuing such policy is not liable for **Loss**, then the **Insurer** shall be liable for payment of the portion of such **Loss** constituting covered **Loss** under this policy (specifically excess of any other valid and collectible employment practices liability insurance providing coverage for such **Loss**).

In the event of a **Claim** made against an **Outside Entity Executive**, coverage as is afforded by this policy, whether under the *Insured Person Coverage* or the *Indemnification Of Insured Person Coverage*, shall be specifically excess of: (a) any indemnification provided by an **Outside Entity**; and (b) any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**. Further, in the event such other **Outside Entity** insurance is provided by the **Insurer** or any other insurance company affiliate thereof ("**Other Policy**") (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a claim as required), then the **Insurer's** maximum aggregate **Limit of Liability** for all **Loss** under this policy, as respects any such **Claim**, shall be reduced by the amount recoverable under such **Other Policy** for loss incurred in connection with such **Claim**.

#### 3. *SUBROGATION*

To the extent of any payment under this policy, the **Insurer** shall be subrogated to all of the **Organizations'** and **Insureds'** rights of recovery. Each **Organization** and each **Insured Person** shall execute all papers reasonably required and provide reasonable assistance and cooperation in securing or enabling the **Insurer** to exercise subrogation rights or any other rights, directly or in the name of the **Organization** or any **Insured Person**.

In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless the Conduct Exclusion applies with regard to such   **Insured**.

© All rights reserved.

Executive Edge



### 4. RECOVERY OF LIMITS

In the event the **Insurer** recovers amounts it paid under this policy, the **Insurer** will reinstate the **Limits of Liability** of this policy to the extent of such recovery, less its costs incurred in administering and obtaining such recovery. The **Insurer** assumes no duty to seek a recovery of any amounts paid under this policy. The **Insurer**, in its sole and absolute discretion, shall determine the amounts to be credited, if any, toward a reinstatement of the **Limits of Liability**.

### B. Cancellation

The **Named Entity** may cancel this policy at any time by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent. This policy may only be canceled by or on behalf of the **Insurer** in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified, or other first class mail, at the **Named Entity Address**, written notice stating when, not less than 15 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect. If the **Named Entity** shall cancel this policy, the **Insurer** shall retain the *pro rata* proportion of the premium herein.

### C. Notice And Authority

The **Named Entity** shall act on behalf of its **Subsidiaries** and each and every **Insured** with respect to the giving of notice of a **Claim, Pre-Claim Inquiry**, **Crisis** or circumstance, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, and the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right to a **Discovery Period**; provided, however, that the foregoing shall not limit the ability of an **Organization** or **Insured** to provide notice of a **Claim, Pre-Claim Inquiry**, **Crisis** or circumstance in accordance with Clause 7. *Notice And Reporting*, or to elect discovery and pay the **Additional Premium Amount** (as defined in Clause 8. *Discovery*).

### D. Currency

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or other elements of **Loss** are stated or incurred in a currency other than United States of America dollars, payment of covered **Loss** due under this policy (subject to the terms, conditions and limitations of this policy) will be made either in such other currency (at the option of the **Insurer** and if agreeable to the **Named Entity**) or, in United States of America dollars, at the rate of exchange published in The Wall Street Journal on the date the **Insurer's** obligation to pay such **Loss** is established (or if not published on such date the next publication date of The Wall Street Journal ).

### E. Assignment

This policy and any and all rights hereunder are not assignable without the written consent of the **Insurer**.

❂ All rights reserved.

# Executive Edge

AIG

## F. Disputes

### 1. ALTERNATIVE DISPUTE RESOLUTION

**ADR Options**

All disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be submitted to an alternative dispute resolution (ADR) process as provided in this clause. The **Named Entity** may elect the type of ADR process discussed below; provided, however, that absent a timely election, the **Insurer** may elect the type of ADR. In that case, the **Named Entity** shall have the right to reject the **Insurer's** choice of the type of ADR process at any time prior to its commencement, after which, the **Insured's** choice of ADR shall control.

**Mediation**

In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 90 days shall have elapsed from the date of the termination of the mediation.

**Arbitration**

In the event of arbitration, the decision of the arbitrator(s) shall be final, binding and provided to both parties, and the arbitration award shall not include attorney's fees or other costs.

**ADR Process**

*Selection of Arbitrator(s) or Mediator*: The **Insurer** and the **Named Entity** shall mutually consent to: (i) in the case of arbitration, an odd number of arbitrators which shall constitute the arbitration panel, or (ii) in the case of mediation, a single mediator. The arbitrator, arbitration panel members or mediator must be disinterested and have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. In the absence of agreement, the **Insurer** and the **Named Entity** each shall select one arbitrator, the two arbitrators shall select a third arbitrator, and the panel shall then determine applicable procedural rules.

*ADR Rules*: In considering the construction or interpretation of the provisions of this policy, the mediator or arbitrator(s) must give due consideration to the general principles of the law of the **State of Formation** of the **Named Entity**. Each party shall share equally the expenses of the process elected. At the election of the **Named Entity**, either choice of ADR process shall be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state reflected in the **Named Entity Address**. The **Named Entity** shall act on behalf of each and every **Insured** under this *Alternative Dispute Resolution Clause*. In all other respects, the **Insurer** and the **Named Entity** shall mutually agree to the procedural rules for the mediation or arbitration. In the absence of such an agreement, after reasonable diligence, the arbitrator(s) or mediator shall specify commercially reasonable rules.

⊕ All rights reserved.

Executive Edge



### 2. ACTION AGAINST INSURER

Except as provided in Clause 12.F.1. *Alternative Dispute Resolution*, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, or until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against such **Insured** after actual trial or by written agreement of the **Insured**, the claimant and the **Insurer**.

Any **Insured** or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against any **Insured** or **Organization** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by any **Insured Person**, his or her spouse or legally recognized domestic partner, any **Organization** or any legal representative of the foregoing.

### G. Spousal, Domestic Partner And Legal Representative Extension

If a **Claim** against an **Insured Person** includes a **Claim** against: (i) the lawful spouse or legally recognized domestic partner of such **Insured Person**; or (ii) a property interest of such spouse or domestic partner, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Insured Person**, this policy shall pay covered **Loss** arising from the **Claim** made against such spouse or domestic partner or the property of such spouse or domestic partner to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or domestic partner. This policy shall pay covered **Loss** arising from a **Claim** made against the estates, heirs, or legal representatives of any deceased **Insured Person**, and the legal representatives of any **Insured Person** in the event of incompetence, insolvency or bankruptcy, who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claim** is based were alleged to have been committed.

### H. Conformance To Law

In the event that there is an inconsistency between: (i) any period of limitation in this policy relating to the giving of notice of cancellation or discovery/extended reporting election, and (ii) the minimum or maximum period required by applicable law, where such law allows, the **Insurer** will resolve the inconsistency by applying the notice period that is more favorable to the **Insureds**. Otherwise, the notice period is hereby amended to the extent necessary to conform to applicable law.

Coverage under this policy shall not be provided to the extent prohibited by any law.

### I. Headings

The descriptions in the headings and the Guide of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

© All rights reserved.

Executive Edge



## 13. DEFINITIONS

Terms with **"Bold"** typeface are used in this policy with the meanings and values ascribed to them below and/or in the Declarations:

**Application**      means:

(1) the written statements and representations made by an **Insured** and provided to the **Insurer** during the negotiation of this policy, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this policy;

(2) all warranties executed by or on behalf of an **Insured** and provided to the **Insurer** in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy issued by the **Insurer**, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time; and

(3) each and every public filing by or on behalf of an **Organization** made with the SEC, including but not limited to the **Organization's** Annual Report(s), 10Ks, 10Qs, 8Ks and proxy statements, any financial information in such filings, and any certifications relating to the accuracy of the foregoing, provided that such public filing was filed during the 12 month period immediately preceding the inception of the **Policy Period**.

**Asset Protection Costs**      means reasonable and necessary fees, costs and expenses consented to by the **Insurer** incurred by an **Executive** of an **Organization** to oppose any efforts by an **Enforcement Body** to seize or otherwise enjoin the personal assets or real property of such **Executive** or to obtain the discharge or revocation of a court order entered during the **Policy Period** in any way impairing the use thereof.

**Claim**      means:

(1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process;

(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges;

(3) an **Insured Person Investigation**;

(4) a **Derivative Demand**;

(5) an official request for **Extradition** of any **Insured Person**, or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

**"Claim"** shall include any **Securities Claim** and any **Employment Practices Claim**.

**Crisis**      has the meaning as defined in the CrisisFund® Appendix attached to this policy.

**CrisisFund®**      means in the case of all **Crisis Loss**, including **Delisting Crisis Loss**, $100,000 for all **Crisis Loss** in the aggregate for all **Crises** first occurring during the **Policy Period** or any applicable **Discovery Period**.

℗ All rights reserved.

Executive Edge



| | |
|---|---|
| **Crisis Loss** | has the meaning as defined in the CrisisFund® Appendix attached to this policy. **"Delisting Crisis Loss"** means a **Crisis Loss** resulting solely from a **Delisting Crisis** (as defined in the CrisisFund® Appendix). |
| **Defense Costs** | means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the cost of **E-Discovery Consultant Services** and premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from: |

(1) the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**; or

(2) an **Insured Person** lawfully: (i) opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or (ii) appealing any order or other grant of **Extradition** of that **Insured Person**.

**Defense Costs** shall not include: (i) **Derivative Investigation Costs**, (ii) **Pre-Claim Inquiry Costs**, or (iii) the compensation of any **Insured Person**.

| | |
|---|---|
| **Derivative Demand** | means a written demand by any shareholder of an **Organization** upon the board of directors (or equivalent management body) of such **Organization** to commence a civil action on behalf of the **Organization** against any **Executive** of the **Organization** for any actual or alleged wrongdoing on the part of such **Executive**. |
| **Derivative Investigation** | means, after receipt by any **Insured** of a **Claim** that is either a **Derivative Suit** or a **Derivative Demand**, any investigation conducted by the **Organization**, or on behalf of the **Organization** by its board of directors (or the equivalent management body) or any committee of the board of directors (or equivalent management body), as to how the **Organization** should respond. |
| **Derivative Investigation Costs** | means reasonable and necessary costs, charges, fees and expenses consented to by the **Insurer** and incurred by the **Organization**, or on behalf of the **Organization** by its board of directors (or the equivalent management body) or any committee of the board of directors (or equivalent management body), in connection with a **Derivative Investigation. Derivative Investigation Costs** shall not include the compensation of any **Insured Person**. |
| **Derivative Suit** | means a lawsuit purportedly brought derivatively on behalf of an **Organization** by a shareholder of such **Organization** against an **Executive** of the **Organization**. |
| **E-Discovery Consultant Services** | means solely the following services performed by an **E-Consultant Firm**: |

(1) assisting the **Insured** with managing and minimizing the internal and external costs associated with the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information (**"E-Discovery"**);

© All rights reserved.

Executive Edge



(2) assisting the **Insured** in developing or formulating an **E-Discovery** strategy which shall include interviewing qualified and cost effective **E-Discovery** vendors;

(3) serving as project manager, advisor and/or consultant to the **Insured**, defense counsel and the **Insurer** in executing and monitoring the **E-Discovery** strategy; and

(4) such other services provided by the **E-Consultant Firm** that the **Insured, Insurer** and **E-Consultant Firm** agree are reasonable and necessary given the circumstances of the **Securities Claim**.

**Employee**  means any past, present or future employee, other than an **Executive** of an **Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee.

**Employment Practices Claim**  means a Claim alleging any:

(1) **Employment Practices Violation**; or

(2) **Third-Party EPL Violation**.

**Employment Practices Retention**  means the Retention applicable to **Loss** that arises out of an **Employment Practices Claim**.

**Employment Practices Violation**  means any actual or alleged:

(1) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(2) harassment (including workplace bullying, sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(3) discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

(4) **Retaliation**;

(5) employment-related misrepresentation(s) to an **Employee** of the **Organization**;

(6) employment-related libel, slander, humiliation, defamation or invasion of privacy;

(7) wrongful failure to employ or promote;

(8) wrongful deprivation of career opportunity with the **Organization**, wrongful demotion or negligent **Employee** evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(9) wrongful discipline;

(10) failure to grant tenure; or

104123 (04/10)                                     19                    © All rights reserved.

Executive Edge 

(11) with respect to any of the foregoing items (1) through (10) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

but only if the **Employment Practices Violation** relates to an **Employee** of an **Organization** or an **Outside Entity**, or an applicant for employment with an **Organization** or an **Outside Entity**, whether committed directly, indirectly, intentionally or unintentionally.

| | |
|---|---|
| **Enforcement Body** | means: (i) any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general), or (ii) the enforcement unit of any securities or commodities exchange or other self-regulatory organization. |
| **Executive** | means any: |

(1) past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position);

(2) past, present and future person in a duly elected or appointed position in an entity organized and operated in a **Foreign Jurisdiction** that is equivalent to an executive position listed in subparagraph (1) above, or a member of the senior-most executive body (including, but not limited to, a supervisory board); and

(3) past, present and future General Counsel and Risk Manager (or equivalent position) of the **Named Entity**.

| | |
|---|---|
| **Extradition** | means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation. |
| **Extradition Costs** | means **Defense Costs** incurred by an **Insured** in lawfully opposing any effort to obtain the **Extradition** of an **Insured Person**. |
| **Foreign Jurisdiction** | means any jurisdiction, other than the United States of America or any of its territories or possessions. |
| **Foreign Policy** | means the standard executive managerial liability policy (including all mandatory endorsements, if any) approved by the **Insurer** or any of its affiliates to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this policy. If more than one such policy exists, then "Foreign Policy" means the standard basic policy form most recently offered for sale for comparable risks by the **Insurer** or any of its affiliates in that **Foreign Jurisdiction**. The term "**Foreign Policy**" shall not include any partnership managerial, pension trust or professional liability coverage. |
| **Insured** | means any: |

(1) **Insured Person**; or

(2) **Organization**.

© All rights reserved.

## Executive Edge

AIG

| | |
|---|---|
| **Insured Person** | means any: |

(1) **Executive** of an **Organization**;

(2) **Employee** of an **Organization**; or

(3) **Outside Entity Executive**.

**Insured Person Investigation**    means any civil, criminal, administrative or regulatory investigation of an **Insured Person**:

(1) once the **Insured Person** is identified in writing by an **Enforcement Body** as a target of an investigation that may lead to a criminal, civil, administrative, regulatory or other enforcement proceeding;

(2) in the case of an investigation by the SEC or any state, local or foreign body with similar regulation or enforcement authority, after the service of a subpoena (or in a **Foreign Jurisdiction**, the equivalent legal process) upon the **Insured Person**; or

(3) commenced by the arrest and detainment or incarceration for more than 24 hours of an **Insured Person** by any law enforcement authority in a **Foreign Jurisdiction**.

Writings which may identify an **Insured Person** as a target can include a target or "Wells" letter, whether or not labeled as such.

**Liberty Protection Costs**    means:

(1) reasonable and necessary fees, costs and expenses consented to by the **Insurer** and incurred by an **Insured Person** in order for an **Insured Person** to lawfully seek the release of the **Insured Person** from any pre-**Claim** arrest or confinement to a (i) specified residence or (ii) secure custodial premises operated by or on behalf of any law enforcement authority; or

(2) reasonable and necessary premiums (but not collateral) consented to by the **Insurer** and incurred by an **Insured Person** for a bond or other financial instrument to guarantee the contingent obligation of the **Insured Person** for a specified amount required by a court that are incurred or required outside the United States of America during the **Policy Period**, if such premiums: (i) arise out of an actual or alleged **Wrongful Act**, or (ii) are incurred solely by reason of such **Insured Person's** status as an **Executive** or **Employee** of an **Organization**; and, in either case, no **Claim** has been made and no **Pre-Claim Inquiry** is known.

**Loss**    means damages, settlements, judgments (including pre/post-judgment interest on a covered judgment), **Defense Costs**, **Crisis Loss**, **Derivative Investigation Costs**, **Liberty Protection Costs** and **Pre-Claim Inquiry Costs**; however, "**Loss**" (other than **Defense Costs**) shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) punitive or exemplary damages; (4) the multiplied portion of multiplied damages; (5) cleanup costs relating to hazardous materials, pollution or product defects; (6) any amounts for which an **Insured** is not financially liable or which are without legal recourse to an **Insured**; and (7) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. Notwithstanding the foregoing subparagraph (7), the **Insurer** shall not assert that, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of

21

◉ All rights reserved.

Executive Edge



1933, as amended, the portion of any amounts incurred by **Insureds** which is attributable to such violations constitutes uninsurable loss, and, unless precluded from doing so in a court of all such settlements, judgments and **Defense Costs** as constituting **Loss** under this policy.

Notwithstanding the foregoing paragraph, **Loss** shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to the Conduct Exclusion): (1) civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B); and (2) solely with respect to **Claims** other than **Employment Practices Claims**, punitive, exemplary and multiplied damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiple damages.

In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith.

| | |
|---|---|
| **Management Control** | means:<br><br>(1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or<br><br>(2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an **Organization**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company. |
| **Non-Indemnifiable Loss** | means **Loss** for which an **Organization** has neither indemnified nor is permitted or required to indemnify an **Insured Person** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an **Organization**. |
| **Organization** | means:<br><br>(1) the **Named Entity**;<br><br>(2) each **Subsidiary**; and<br><br>(3) in the event a bankruptcy proceeding shall be instituted by or against any of the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States of America), if any. |

104123 (04/10)

© All rights reserved.

Executive Edge

AIG

| | |
|---|---|
| **Outside Entity** | means any: (1) not-for-profit entity; or (2) other entity listed as an **"Outside Entity"** in an endorsement attached to this policy. |
| **Outside Entity Executive** | means any: (1) **Executive** of an **Organization** who is or was acting at the specific request or direction of an **Organization** as an **Executive** of an **Outside Entity**; or (2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this policy. |

In the event of a disagreement between the **Organization** and an **Outside Entity Executive** as to whether such **Insured** was acting "at the specific request or direction of the **Organization**," this policy shall abide by the determination of the **Organization** on this issue and such determination shall be made by written notice to the **Insurer** within ninety (90) days after the **Claim** against such **Outside Entity Executive** is made.  In the event no notice of any such determination is given to the **Insurer** within such period, this policy shall apply as if the **Organization** determined that such **Outside Entity Executive** was not acting at the **Organization's** specific request or direction.

| | |
|---|---|
| **Personal Reputation Crisis** | means any negative statement that is included in any press release or published by any print or electronic media outlet regarding an **Executive** of an **Organization** made during the **Policy Period** by any individual authorized to speak on behalf of an **Enforcement Body**. |
| **Personal Reputation Expenses** | means reasonable and necessary fees, costs and expenses of a **Crisis Firm** (as defined in the CrisisFund® Appendix attached to this policy) retained within 30 days of a **Personal Reputation Crisis** solely and exclusively by an **Executive** to mitigate the adverse effects specifically to such **Executive's** reputation from a **Personal Reputation Crisis**.  "**Personal Reputation Expenses**" shall not include any fees, costs or expenses of any **Crisis Firm** incurred by an **Executive** if such **Crisis Firm** is also retained by or on behalf of an **Organization**. |
| **Policy Period** | means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in such Item 2 or the effective date of cancellation of this policy. |
| **Pre-Claim Inquiry** | means any pre-**Claim**: |

(1) verifiable request for an **Insured Person** of any **Organization**: (a) to appear at a meeting or interview; or (b) produce documents that, in either case, concerns the business of that **Organization** or that **Insured Person's** insured capacities, but only if the request came from any:

   (i)   **Enforcement Body**; or

   (ii)  **Organization**, or, on behalf of an **Organization**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body):

      (A)  arising out of an inquiry or investigation by an **Enforcement Body** concerning the business of that **Organization** or that **Insured Person's** insured capacities; or

      (B)  as part of its **Derivative Investigation**; and

© All rights reserved.

Executive Edge                                                    AIG

(2) arrest or confinement of an **Executive** of an **Organization** to a: (a) specified residence; or (b) secure custodial premises operated by or on behalf of an **Enforcement Body**, in connection with the business of any **Organization** or an **Insured Person's** capacity as an **Executive** or **Employee** of an **Organization**.

**"Pre-Claim Inquiry"** shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in an **Organization's** and/or **Enforcement Body's** normal review or compliance process.

**Pre-Claim Inquiry Costs**    means the reasonable and necessary pre-**Claim** fees, costs and expenses consented to by the **Insurer** and incurred by an **Insured Person** solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** directed to such **Insured Person**, including attendance at an interview or meeting requested by an **Enforcement Body**, but excluding (i) any compensation of any **Insured Person**; and (ii) the costs of complying with any formal or informal discovery or other request seeking documents, records or electronic information in the possession or control of an **Organization**, the requestor or any other third party .

**Related Claim**    means a **Claim** alleging, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were either: (i) alleged in another **Claim** made against an **Insured**; or (ii) the subject of a **Pre-Claim Inquiry** received by an **Insured Person**.

**Related Pre-Claim Inquiry**    means a **Pre-Claim Inquiry** involving, arising out of, based upon or attributable to any facts or **Wrongful Acts** that are the same as or related to those that were either: (i) alleged in a **Claim** made against an **Insured**; or (ii) the subject of another **Pre-Claim Inquiry** received by an **Insured Person**.

**Retaliation**    means a retaliatory act of an **Insured** alleged to be in response to any of the following activities: (i) the disclosure or threat of disclosure by an **Employee** of the **Organization** or an **Outside Entity** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (ii) the actual or attempted exercise by an **Employee** of the **Organization** or an **Outside Entity** of any right that such **Employee** has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (iii) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (iv) strikes of an **Employee** of the **Organization** or an **Outside Entity**.

                          ◊ All rights reserved.

Executive Edge                                              

| | |
|---|---|
| **Securities Claim** | means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**: |

(1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

    (i) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or

    (ii) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization**; or

(2) which is a **Derivative Suit**.

Notwithstanding the foregoing, the term "**Securities Claim**" shall include an administrative or regulatory proceeding against an **Organization** that meets the requirements of subparagraph (1) above, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**.

| | |
|---|---|
| **Securities Retention** | means the Retention applicable to **Loss** (including **Pre-Claim Inquiry Costs**) that arises out of (i) a **Securities Claim**, or (ii) **Pre-Claim Inquiry Costs** incurred in response to: (a) a **Pre-Claim Inquiry** by an **Enforcement Body** charged with the regulation of securities, or (b) a **Derivative Investigation**. |
| **SOX 304 Costs** | means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the premium or origination fee for a loan or bond) and incurred by the chief executive officer or chief financial officer of the **Named Entity** solely to facilitate the return of amounts required to be repaid by such **Executive** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002. **SOX 304 Costs** do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Executive** pursuant to Section 304(a). |
| **Subsidiary** | means: |

(1) any for-profit entity that is not formed as a partnership of which the **Named Entity** has or had **Management Control** on or before the inception of the **Policy Period** either directly or indirectly through one or more of its other **Subsidiaries**; and

(2) any not-for-profit entity sponsored exclusively by an **Organization**.

A for-profit entity ceases to be a **Subsidiary** when the **Named Entity** no longer maintains **Management Control** of such entity either directly or indirectly through one or more of its **Subsidiaries**. A not-for-profit entity ceases to be a **Subsidiary** when such entity is no longer sponsored exclusively by an **Organization**.

                          © All rights reserved.

Executive Edge



| | |
|---|---|
| **Third-Party EPL Violation** | means any actual or alleged harassment or unlawful discrimination, as described in subparagraphs (2) and (3) of the definition of **Employment Practices Violation**, or the violation of the civil rights of a person relating to such harassment or discrimination, when such acts are alleged to be committed against anyone other than an **Insured Person** or applicant for employment with the **Organization** or an **Outside Entity**, including, but not limited to, students, patients, members, customers, vendors and suppliers. |
| **Transaction** | means: |

(1) the **Named Entity** consolidating with or merging into another entity such that the **Named Entity** is not the surviving entity, or selling all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert;

(2) any person or entity or group of persons or entities acting in concert acquiring **Management Control** of the **Named Entity**; or

(3) the appointment by any **Enforcement Body** of, or where any **Enforcement Body** assumes the role of, a trustee, receiver, conservator, rehabilitator, liquidator or similar official to take control of, supervise or oversee the **Named Entity**, or to liquidate or sell all or substantially all of the assets of the **Named Entity**.

| | |
|---|---|
| **UK Corporate Manslaughter Act Defense Costs** | means **Defense Costs** incurred by an **Insured Person** that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Organization** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction. |
| **Wrongful Act** | means: |

(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged **Employment Practices Violation** or **Third-Party EPL Violation**:

(i) with respect to any **Executive** of an **Organization**, by such **Executive** in his or her capacity as such or any matter claimed against such **Executive** solely by reason of his or her status as such;

(ii) with respect to any **Employee** of an **Organization**, by such **Employee** in his or her capacity as such, but solely in regard to any: (a) **Securities Claim**; or (b) other **Claim** so long as such other **Claim** is also made and continuously maintained against an **Executive** of an **Organization**; or

(iii) with respect to any **Outside Entity Executive**, by such **Outside Entity Executive** in his or her capacity as such or any matter claimed against such **Outside Entity Executive** solely by reason of his or her status as such; or

(2) with respect to an **Organization**, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Organization**, but solely in regard to a **Securities Claim**.

                    © All rights reserved.

## CRISISFUND® APPENDIX

### I. DEFINITIONS

(a) "**Crisis**" means:

    (1) a **Delisting Crisis**; or

    (2) one of the following events which, in the good faith opinion of the Chief Financial Officer of an **Organization** did cause or is reasonably likely to cause a "**Material Effect on an Organization's Common Stock Price**":

        (i) *Negative earning or sales announcement*
The public announcement of an **Organization's** past or future earnings or sales, which is substantially less favorable than any of the following: (i) an **Organization's** prior year's earnings or sales for the same period; (ii) an **Organization's** prior public statements or projections regarding earnings or sales for such period; or (iii) an outside securities analyst's published estimate of an **Organization's** earnings or sales.

        (ii) *Loss of a patent, trademark or copyright or major customer or contract*
The public announcement of an unforeseen loss of: (i) an **Organization's** intellectual property rights for a patent, trademark or copyright, other than by expiration; (ii) a major customer or client of an **Organization**; or (iii) a major contract with an **Organization**.

        (iii) *Product recall or delay*
The public announcement of the recall of a major product of an **Organization** or the unforeseen delay in the production of a major product of an **Organization**.

        (iv) *Mass tort*
The public announcement or accusation that an **Organization** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof.

        (v) *Employee layoffs or loss of key executive officer(s)*
The public announcement of layoffs of **Employees** of an **Organization**. The death or resignation of one or more key **Executives** of the **Named Entity**.

        (vi) *Elimination or suspension of dividend*
The public announcement of the elimination or suspension of a regularly scheduled dividend previously being paid by an **Organization**.

        (vii) *Write-off of assets*
The public announcement that an **Organization** intends to write off a material amount of its assets.

        (viii) *Debt restructuring or default*
The public announcement that an **Organization** has defaulted or intends to default on its debt or intends to engage in a debt restructuring.

        (ix) *Bankruptcy*
The public announcement that an **Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of an **Organization**; or that bankruptcy proceedings are imminent, whether voluntary or involuntary.

        (x) *Governmental or regulatory litigation*
The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against an **Organization**.

    (xi)   *Unsolicited takeover bid*

An unsolicited written offer or bid by any person or entity other than an **Insured** or any affiliate of any **Insured**, whether publicly announced or privately made to an **Executive** of an **Organization**, to effect a **Transaction** of the **Named Entity**.

A **Crisis** shall first commence when an **Organization** or any of its **Executives** shall first become aware of such **Crisis**. A **Crisis** shall conclude once a **Crisis Firm** advises an **Organization** that such **Crisis** no longer exists or when the **CrisisFund** has been exhausted.

(b)  "**Crisis Firm**" means any public relations firm, crisis management firm or law firm on the list of approved firms that is accessible through the online directory at http://www.chartisinsurance.com/panelcounseldirectory under the "CrisisFund®" link. Solely for **Delisting Crises**, "**Crisis Firm**" shall also include any **Panel Counsel** (as defined in Clause 9.B. of the policy) approved to handle **Securities Claims**. Any "**Crisis Firm**" may be hired by an **Organization** to perform **Crisis Services** without further approval by the **Insurer**.

(c)  "**Crisis Loss**" means the following amounts incurred during the pendency of a **Crisis** for which an **Organization** is legally liable:

    (1)  the reasonable and necessary fees and expenses incurred by a **Crisis Firm** in the performance of **Crisis Services** for an **Organization**;

    (2)  the reasonable and necessary fees and expenses incurred in the printing, advertising or mailing of materials; and

    (3)  travel costs incurred by **Executives**, employees or agents of an **Organization** or of the **Crisis Firm**, arising from or in connection with the **Crisis**.

(d)  "**Crisis Services**" means those services performed by a **Crisis Firm** in advising an **Insured** or any **Employee** of an **Organization** on minimizing potential harm to an **Organization** from the **Crisis** (including but not limited to maintaining and restoring investor confidence in an **Organization**), and solely with respect to **Delisting Crisis Loss**, any legal services performed by a **Crisis Firm** in responding to a **Delisting Crisis**.

(e)  "**Delisting Crisis**" means written notice to an **Organization** that such **Organization's** securities will be or have been delisted from an **Exchange** at the initiation of such **Exchange**.

(f)  "**Exchange**" means NASDAQ, the American Stock Exchange, the New York Stock Exchange and the Singapore Exchange.

(g)  "**Material Effect on an Organization's Common Stock Price**" means, within a period of 24 hours, that the price per share of an **Organization's** common stock shall decrease by the greater of $2.00, or 15% net of the percentage change in the Standard & Poor's Composite Index.

## II.  EXCLUSIONS

The term **Crisis** shall not include any event relating to any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

## ENDORSEMENT# *1*

This endorsement, effective *12:01 am*      *March 4, 2017*           forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CALIFORNIA AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" mean the insurance company which issued this policy;   and 2), "Named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Entity, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

The following is added any supersedes any provision to the contrary:

<u>CANCELLATION</u>

The First Named Insured shown in the declarations may cancel the policy by mailing or delivering to the Insurer advance written notice of cancellation.

If the policy has been in effect for more than sixty (60) days or if it is a renewal, effective immediately, the Insurer may not cancel the policy unless such cancellation is based on one or more of the following reasons:

(1)   Nonpayment of premium, including payment due on a prior policy issued by the Insurer and due during the current policy term covering the same risks.

(2)   A judgment by a court or an administrative tribunal that the named Insured has violated any law of this state of or of the United States having as one of its necessary elements an act which materially increases any of the risks insured against.

(3)   Discovery of fraud or material misrepresentation by either of the following:

a)   The Insured or Other Insured(s) or his or her representative in obtaining the insurance; or

b)   The named Insured or his or her representative in pursuing a claim under the policy.

(4)   Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the named Insured or Other Insured(s) or a representative of same, which materially increase any of the risks insured against.

(5)   Failure by the named Insured or Other Insured(s) or a representative of same to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan if the failure materially increases any of the risks insured against.

(6)   A determination by the commissioner that the loss of, or changes in, an insurer's reinsurance covering all or part of the risk would threaten the financial integrity or solvency of the Insurer.

⊕ All rights reserved.
*END 001*

## ENDORSEMENT# *1*   (continued)

(7)   A determination by the commissioner that a continuation of the policy coverage could place the Insurer in violation of the laws of this state or the state of its domicile or that the continuation of coverage would threaten the solvency of the Insurer.

(8)   A change by the named Insured or Other Insured(s) or a representative of same in the activities or property of the commercial or industrial enterprise which results in a material added risk, a materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the policy.

Notice of cancellation shall be delivered or mailed to the producer of record and the named Insured at least thirty (30) days prior to the effective date of cancellation. Where cancellation is for nonpayment of premium or fraud, notice shall be given no less than ten (10) days prior to the effective date of cancellation.

## CONDITIONAL RENEWAL AND NONRENEWAL

If the Insurer decides not to renew the policy, or to increase the deductible, reduce the limits, eliminate coverages or raise premium more than 25%, the Insurer shall mail or deliver to the producer of record and the named Insured notice of nonrenewal at least sixty (60) days but no more than 120 days prior to the end of the policy period. The notice shall contain the reason for nonrenewal of the policy.

A notice of nonrenewal shall not be required in the following situations:

(1)   If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between the Insurer and a member of the insurance group.

(2)   If the policy has been extended for 90 days or less, provided that notice has been given in accordance with the nonrenewal notice requirements noted above.

(3)   If the Named Insured has obtained replacement coverage, or has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

(4)   If the policy is for a period of no more than 60 days and the Insured is notified at the time of issuance that it will not be renewed.

(5)   If the First Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

(6)   If the Insurer has made a written offer to the First Named Insured, in accordance with timeframes shown above to renew the policy under changed terms or conditions or at an increased premium rate.

If the Insurer fails to give timely notice, the policy of insurance shall be continued, with no change in its terms or conditions, for a period of 60 days after the Insurer gives notice.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 001*

### ENDORSEMENT# *2*

This endorsement, effective *12:01 am*      *March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**ADVANCEMENT AMENDED
NOT IN DEFAULT OF PAYMENT
RETURN OF PAYMENTS**

In consideration of the premium charged, it is hereby understood and agreed that Clause 3.A. *Advancement* is deleted in its entirety and replaced with the following:

A. *Advancement*

If for any reason (including but not limited to insolvency) an **Organization** fails or refuses to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Insured Person** until either (i) an **Organization** agrees to make, and is not in default of making, such payments, or (ii) the Retention has been satisfied.  In no event shall any such advancement by the **Insurer** relieve any **Organization** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**.

Advancement, payment or indemnification of an **Insured Person** by an **Organization** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Organization** within 60 days of such request; and advancement, payment or indemnification by an **Organization** is deemed "refused" if an **Organization** gives a written notice of the refusal to the **Insured Person**.  Advancement, payment or indemnification of an **Insured Person** by an **Organization** shall only be deemed "failed" or "refused" to the extent such advancement, payment or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from an **Organization**.  Any payment or advancement by the **Insurer** within an applicable Retention shall apply towards the exhaustion of the **Limits of Liability,** but the **Limit of Liability** shall be restored to the extent that any such payments are subsequently returned or repaid to the **Insurer**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.

**END 002**

108587 (4/11)                    1

**ENDORSEMENT# 3**

This endorsement, effective *12:01 am*    *March 4, 2017*        forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**ALLOCATION AMENDED
(ADD REASONABLY)**

In consideration of the premium charged, it is hereby understood and agreed that the
second paragraph of Clause 9.D. *Allocation* is deleted in its entirety and replaced with the
following:

With respect to: (i) **Defense Costs** jointly incurred by; (ii) any joint settlement entered
into by; and/or (iii) any judgment of joint and several liability against any **Organization**
and any **Insured Person** in connection with any **Claim** other than a **Securities Claim**,
such **Organization** and such **Insured Person** and the **Insurer** agree to use their best
efforts to determine a fair and proper allocation of the amounts as between such
**Organization**, such **Insured Person** and the **Insurer**, taking into account the relative legal
and financial exposures, and the relative benefits obtained by such **Insured Person** and
such **Organization**. In the event that a determination as to the amount of **Defense Costs**
to be advanced under this policy cannot be agreed to, then the **Insurer** shall advance
**Defense Costs** excess of any applicable Retention which the **Insurer** reasonably states
to be fair and proper until a different amount shall be agreed upon or determined
pursuant to the provisions of this policy and applicable law.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 003*

ENDORSEMENT# *4*

This endorsement, effective at *12:01 am    March 4, 2017*       forms a part of
Policy number *01-277-10-42*
Issued to: *T3 MOTION, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *Executive Edge*

## ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made in full compliance with enforceable United Nations economic and trade sanctions and the trade and economic sanction laws or regulations of the European Union and the United States of America, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

All rights reserved.

*END 004*

119679 (9/15)                    Page 1 of 1

ENDORSEMENT# *5*

This endorsement, effective *12:01 am*    *March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## ALTERNATIVE DISPUTE RESOLUTION CLAUSE
## (WAITING PERIOD AMENDED)

In consideration of the premium charged, it is hereby understood and agreed that Clause 12.F.1. *ALTERNATIVE DISPUTE RESOLUTION* is amended by deleting the paragraph entitled, *Mediation*, in its entirety and replacing it with the following:

*Mediation*             In the event of mediation, either party shall have the right to
                        commence a judicial proceeding; provided, however, that no
                        such judicial proceeding shall be commenced until the
                        mediation shall have been terminated and at least *Sixty (
                        60*) days shall have elapsed from the date of the termination
                        of the mediation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 005*

104124 (4/10)                 1

ENDORSEMENT# *6*

This endorsement, effective at *12:01 am   March 4, 2017*          forms a part of
Policy number *01-277-10-42*
Issued to: *T3 MOTION, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *Executive Edge*

## CLASS CERTIFICATION EVENT STUDY EXPENSES
## (REMOVES ADMISSIBLE TRIGGER)

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

### I.

Clause 2. EXTENSIONS is amended by adding the following to the end thereof:

*D. Class Certification Event Study Expenses*

For any **Securities Claim**, no Retention shall apply to **Loss** incurred as **Class Certification Event Study Expenses**.

### II.

The definition of **Loss** shall include **Class Certification Event Study Expenses**.

### III.

Clause 13. DEFINITIONS is further amended by adding the following:

| **Class Certification Event Study Expenses** | means the reasonable fees, costs and expenses of an expert witness consented to by the **Insurer**, which consent shall not be unreasonably withheld, incurred by an **Insured** to conduct an event study regarding class certification in a **Securities Claim**. |
|---|---|

### IV.

If any **Panel Counsel** firm, including any firm added as approved **Panel Counsel** by endorsement to this policy, defending a **Securities Claim** recommends to the **Insured** a specific expert witness to conduct an event study in the defense of such **Securities Claim**, then the **Insured** may hire such expert witness to perform such event study without further approval by the **Insurer**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 006*

### ENDORSEMENT# 7

This endorsement, effective *12:01 am*      *March 4, 2017*      forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**APPLICATION AMENDED
UNDERWRITING OF THIS POLICY
WRITTEN REPRESENTATIONS AND PUBLIC FILINGS**

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting subparagraph (1) of the definition of **Application** and replacing it with the following:

  (1) the written statements and written representations made by an **Insured** and provided to the **Insurer** during the underwriting of this policy, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this policy; provided that public filings by or on behalf of an **Organization** made with the SEC shall only include those as set forth in subparagraph (3) below;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
**END 007**

106827 (9/10)                    1

### ENDORSEMENT# *8*

This endorsement, effective *12:01 am*      *March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

## APPLICATION AND UNDERWRITING AMENDED
## KNOWLEDGE REVISIONS

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended by deleting Clause 11.D. *Severability Of The Application* in its entirety and replacing it with the following:

D. *Severability of the Application*

The **Application** shall be construed as a separate application for coverage by each **Insured Person**. With respect to the **Application** or otherwise in connection with the underwriting of this policy, no knowledge possessed by any **Organization** or any **Insured Person** shall be imputed to any other **Insured Person**.

If the statements, warranties and representations in the **Application** were not accurate and complete and materially affected either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then the **Insurer** shall have the right to void coverage under this policy, *ab initio*, with respect to:

(1) **Loss** under Insuring Agreement B. *Indemnification Of Insured Person Coverage* for the indemnification of any **Insured Person** who knew of facts, as of the inception date of the **Policy Period**, that were not accurately and completely disclosed; and

(2) **Loss** under Insuring Agreement C. *Organization Coverage* if any **Insured Person** who is or was a chief executive officer or chief financial officer of the **Named Entity** knew of facts, as of the inception date of the **Policy Period**, that were not accurately and completely disclosed.

The foregoing applies even if the **Insured Person** did not know that such incomplete or inaccurate disclosure had been provided to the **Insurer** or included within the **Application**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 008*

107032 (10/10)

## ENDORSEMENT# *9*

This endorsement, effective *12:01 am*    *March 4, 2017*         forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### APPLICATION AND UNDERWRITING AMENDED
### RELIANCE AND INCORPORATION

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended by deleting Clause 11.A. *Application And Reliance* in its entirety and replacing it with the following:

   A. *Application And Reliance*

   The **Insurer** has relied upon the statements, warranties and representations contained in the **Application,** and all such statements, warranties and representations are to be considered as incorporated into this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 009*

107033 (10/10)                1

## ENDORSEMENT# *10*

This endorsement, effective *12:01 am*     *March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### BANKRUPTCY WAIVER ADDED

In consideration of the premium charged, it is hereby understood and agreed that Clause 3.C. *Bankruptcy And Insolvency* is amended by adding the following to the end thereof:

It is further understood and agreed that the coverage provided under this policy is intended to protect and benefit the **Insured Persons**. Further, if a liquidation or reorganization proceeding is commenced by the **Named Entity** and/or any other **Organization** (whether voluntarily or involuntarily) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively **"Bankruptcy Law"**) then, in regard to a covered **Claim** under this policy, the **Insureds** hereby:

(a) waive and release any automatic stay or injunction to the extent it may apply in such proceeding to the proceeds of this policy under such **Bankruptcy Law**; and

(b) agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from any stay or injunction applicable to the proceeds of this policy as a result of the commencement of such liquidation or reorganization proceeding.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

### *END 010*

106012 (7/10)                    1

## ENDORSEMENT# *11*

This endorsement, effective *12:01 am*     *March 4, 2017*          forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CAPTIVE INSURANCE COMPANY EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
**Insurer** shall not be liable to make any payments for **Loss** in connection with any **Claim**
made against any **Insured** alleging, arising out of, based upon, or attributable to the
ownership, management, maintenance, operation and/or control by the **Organization** of any
captive insurance company or entity including but not limited to any **Claim** alleging the
insolvency or bankruptcy of an **Organization** as a result of such ownership, operation,
management and control.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

**END 011**

104126 (4/10)                    1

## ENDORSEMENT# *12*

This endorsement, effective *12:01 am    March 4, 2017*              forms a part of
policy number *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CLAIM DEFINITION AMENDED
## REQUESTS TO TOLL STATUTE OF LIMITATIONS

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

### I.

Clause 13. DEFINITIONS, the definition of **"Claim"** is amended by adding the following
subparagraph (6) as follows:

(6)    the receipt by an **Insured** of any written request to toll a period or statute of
limitations which may be applicable to any **Claim** that may be made for any
**Wrongful Act** of any **Insured**.

### II.

Clause 7. NOTICE AND REPORTING, the last sentence of subparagraph (c), entitled "
*Relation Back to Reported Circumstances Which May Give Rise to a Claim*," is deleted in
its entirety and replaced with the following:

In order to be effective, notification of circumstances must specify the facts,
circumstances, nature of the **Wrongful Act** anticipated and reasons for anticipating
such Claim, with full particulars as to dates, persons and entities involved.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊙All rights reserved.
**END 012**

115281 (5/13)                          Page 1 of 1

### ENDORSEMENT# *13*

This endorsement, effective *12:01 am*      *March 4, 2017*      forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### COMMISSIONS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, or attributable to:

(i)   payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign government or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated; or

(ii)   payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, principal shareholders, or owners or employees, or **"Affiliates"** (as that term is defined in The Securities Exchange Act of 1934, including any officers, directors, agents, owners, partners, representatives, principal shareholders or employees of such **Affiliates**) of any customers of the **Organization** or any members of their family or any entity with which they are affiliated; or

(iii)   political contributions, whether domestic or foreign.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 013*

104930 (4/10)                                    Page 1 of 1

**ENDORSEMENT# *14***

This endorsement, effective *12:01 am      March 4, 2017*      forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## CONDUCT EXCLUSIONS AMENDED
### (FINAL, NON-APPEALABLE ADJUDICATION IN ANY UNDERLYING PROCEEDING PERSONAL PROFIT AND FINANCIAL ADVANTAGE)

In consideration of the premium charged, it is hereby understood and agreed that Clause 4.B.(1) *Conduct* is deleted in its entirety and replaced with the following:

(1) *Conduct*    arising out of, based upon or attributable to any:

(a) remuneration, personal profit or other financial advantage to which the **Insured** was not legally entitled; or

(b) deliberate criminal or deliberate fraudulent act by the **Insured**;

if established by any final, non-appealable adjudication in any underlying proceeding;

provided, however:

(i) Conduct Exclusion (a), above, shall not apply in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, to the portion of any **Loss** attributable to such violations; and

(ii) with respect to Conduct Exclusion (b), for acts or omissions which are treated as a criminal violation in a **Foreign Jurisdiction** that are not treated as a criminal violation in the United States of America, the imposition of a criminal fine or other criminal sanction in such **Foreign Jurisdiction** will not, by itself, be conclusive proof that a deliberate criminal or deliberate fraudulent act occurred;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊕All rights reserved.
***END 014***

113731 (3/13)              Page 1 of 1

**ENDORSEMENT# *15***

This endorsement, effective *12:01 am*    *March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### CRISISPLUS ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that he policy is hereby amended as follows:

I.    **CRISISFUND® AMENDED**

(1)    Solely for the purposes of a **Financial Statement Crisis**, the CrisisFund® Appendix is hereby amended as follows:

(i)    Definition (a) **Crisis** shall also mean:

(3)    a **Financial Statement Crisis**.

(ii)    Definition (b) **Crisis Firm** is hereby amended by adding the following at the end thereof:

(b)    Solely for **Financial Statement Crisis**, "**Crisis Firm(s)**" shall also include any **Panel Counsel** (as defined in Clause 9.B. of the policy) approved to handle **Securities Claims** and/or any public accounting firm.

(iii)    Definition (d) **Crisis Services** is hereby deleted in its entirety and replaced by the following:

"**Crisis Services**" means any legal or accounting services performed by a **Crisis Firm(s)** in investigating and responding to a **Financial Statement Crisis**.

(iv)    The following additional definitions are hereby added:

"**Financial Statement Crisis**" means the written public announcement by an **Organization** of the need or potential need for a restatement(s) of an **Organization's** previously publicly filed financial statements; provided however, that **Financial Statement Crisis** shall not include any announcements regarding restatement(s) resulting, in whole or in part, from a change in any rule, law or statute relating to financial reporting (including but not limited to any change in Generally Accepted Accounting Principles); further provided that payment of any **Crisis Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

"**Financial Statement Crisis Loss**" means a **Crisis Loss** resulting solely from a **Financial Statement Crisis**.

II.    **DEFINITION OF EXECUTIVE AMENDED**

In Clause 13. DEFINITIONS, the Definition of **Executive** is hereby amended to include the following:

◉ All rights reserved.
*END 015*

<u>**ENDORSEMENT#**</u> *15*    (continued)

(4)    **Executive** as defined in (1)-(3) above or any **Employee** of an **Organization** serving as a past, present or future member of any internal committee established by and for an **Organization**, including but not limited to an **Organization's** "audit committee," as that committee is described in the Securities and Exchange Commission Release No. 34-42266-Audit Committee Disclosure Rule.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 015*

ENDORSEMENT# *16*

This endorsement, effective *12:01 am*    *March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## DERIVATIVE INVESTIGATION COSTS AMENDED

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting the definition of Derivative Investigation Costs in its entirety and replacing it with the following:

| | |
|---|---|
| **Derivative Investigation Costs** | means reasonable and necessary costs, charges, fees and expenses consented to by the **Insurer** and incurred by the **Organization**, or on behalf of the **Organization** by its board of directors (or the equivalent management body) or any committee of the board of directors or formed as such by the board of directors (or equivalent management body), in connection with a **Derivative Investigation**. **Derivative Investigation Costs** shall not include the compensation of any **Insured Person**. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◎ All rights reserved.
*END 016*

108594 (4/11)                    1

## ENDORSEMENT# *17*

This endorsement, effective *12:01 am*    *March 4, 2017*    forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**DISCOVERY CLAUSE AMENDED**
**DELETE "OR REPLACED"**

In consideration of the premium charged, it is hereby understood and agreed that in Clause 8. DISCOVERY, the section entitled *"Bilateral Discovery Options"* is deleted in its entirety and replaced with the following:

*Bilateral Discovery Options*

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Insureds** shall have the right to a period of one to six years following the effective date of such cancellation or nonrenewal (the **"Discovery Period"**), upon payment of the respective **"Additional Premium Amount"** described below, in which to give to the **Insurer** written notice pursuant to Clause 7(a) and Clause 7(c) of the policy of: (i) **Claims** first made against an **Insured**; (ii) **Pre-Claim Inquiries** first received by an **Insured Person**; and (iii) circumstances of which an **Organization** or an **Insured** shall become aware, in any such case, during said **Discovery Period** and solely with respect to a **Wrongful Act** that occurs prior to the end of the **Policy Period**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 017*

106006 (7/10)                                        1

ENDORSEMENT# *18*

This endorsement, effective *12:01 am    March 4, 2017*      forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DODD-FRANK 954 COSTS ADDED

In consideration of the premium charged, it is hereby understood and agreed that the policy
is amended as follows:

I.

Clause 2.A *Executive Protection* Suite is amended by deleting subparagraph (1) thereof in
its entirety and replacing it with the following:

(1) **SOX 304 Costs** and **Dodd-Frank 954 Costs**;

II.

Clause 13. DEFINITIONS is amended by adding the following at the end thereof:

| | |
|---|---|
| **Dodd-Frank 954 Costs** | means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the premium or origination fee for a loan or bond) and incurred by an **Executive** to facilitate the return of amounts required to be repaid by such **Executive** pursuant to Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. **Dodd-Frank 954 Costs** do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Insured Person** pursuant to Section 954. |

ALL OTHER TERMS, CONDITIONS AND LIMITATIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

©All rights reserved.
*END 018*

115283 (5/13)                    Page 1 of 1

ENDORSEMENT# *19*

This endorsement, effective *12:01 am*    *March 4, 2017*    forms a part of
policy number  *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### ENTITY V. INSURED EXCLUSION AMENDED
### (PARAGRAPH B INAPPLICABLE TO FORMER EXECUTIVES THREE YEARS REMOVED, CARVEBACK C FOR BANKRUPTCY CONSTITUENCIES, DIP CLAIMS AGAINST FORMER INSUREDS, FOREIGN JURISDICTION, SOX 304 AND DODD FRANK 954 COSTS CARVEBACKS, WHISTLEBLOWER SUBPOENA)

In consideration of the premium charged, it is hereby understood and agreed that Clause 4.B(5) *Entity v. Insured Exclusion* is deleted in its entirety and replaced with the following:

(5)  *Entity v. Insured*    that is brought by or on behalf of any **Organization** against any **Insured**, or by any **Outside Entity** against any **Outside Entity Executive**; provided, however, this exclusion shall not apply:

(a) to any **Defense Costs** which constitute **Non-Indemnifiable Loss** incurred by any **Insured Person** in defending any **Claim** against that **Insured Person**;

(b) to any **Derivative Suit** not brought, controlled or materially assisted by any **Organization**, any **Outside Entity** or any **Executive** of the foregoing (other than an **Executive** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, general counsel or risk manager (or equivalent position) of or consultant for an **Organization** for at least three (3) years prior to such **Derivative Suit** being first made; or

(c) if the **Organization** or **Outside Entity** is the subject of a bankruptcy case (or the equivalent in a **Foreign Jurisdiction**), any **Claim** brought by the examiner, trustee, receiver, liquidator, rehabilitator, creditors committee, bondholder committee, equity committee or any other creditor or group of creditors on behalf of or in the right of such **Organization** or **Outside Entity** (or the resulting debtor-in-possession); or

(d) to any **Claim** brought or maintained in any **Foreign Jurisdiction** to the extent the **Organization** is required to bring and maintain the **Claim** in such **Foreign Jurisdiction**; or

℗All rights reserved.

### END 019

**ENDORSEMENT#** *19*

(e) to any **SOX 304 Costs** or **Dodd-Frank 954 Costs** incurred by any **Executive** in connection with a **Claim** by or on behalf of any **Organization** seeking recovery of incentive-based compensation from such **Executive** due to an accounting restatement by such **Organization**.

This exclusion shall not apply to any **Claim** brought by the **Organization** as a debtor-in-possession against an **Insured Person** that is no longer acting in his or her capacity as an **Insured Person** at the time that such **Claim** is brought, provided that such **Claim** is (i) brought after such **Organization** has replaced its chief executive officer, chief financial officer, president and chairman of the board (or equivalent positions), and (ii) not brought, controlled or materially assisted by any individual set forth in (i) above.

With respect to this *Entity v. Insured Exclusion*, the term "materially assisted" shall not be triggered by: (i) any **Insured Person** engaging in protected "whistleblower" activity; or (ii) any **Organization** or **Executive** providing information required in order to comply with a subpoena or similar legal process served upon such **Organization** or **Executive**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊕All rights reserved.
*END 019*

115284 (5/13)                    Page 2 of 2

**ENDORSEMENT# *20***

This endorsement, effective *12:01 am     March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## EXTRADITION AMENDED
## SOUGHT TO BE SURRENDERED

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting the definition of **"Extradition"** in its entirety and replacing it with the following:

**Extradition**          means any formal process by which an **Insured Person** located in any country is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
***END 020***

106829 (9/10)                          1

**ENDORSEMENT# _21_**

This endorsement, effective _12:01 am_      _March 4, 2017_          forms a part of
policy number    _01-277-10-42_
issued to _T3 MOTION, INC._

by    _National Union Fire Insurance Company of Pittsburgh, Pa._

## LIBERTY PROTECTION COSTS AMENDED
## DELETE NO CLAIM MADE OR PRE-CLAIM INQUIRY KNOWN REQUIREMENT

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting subparagraph (2) of the definition of **Liberty Protection Costs** and replacing it with the following:

(2) reasonable and necessary premiums (but not collateral) consented to by the **Insurer** and incurred by an **Insured Person** for a bond or other financial instrument to guarantee the contingent obligation of the **Insured Person** for a specified amount required by a court that are incurred or required outside the United States of America during the **Policy Period**, if such premiums: (i) arise out of an actual or alleged **Wrongful Act**, or (ii) are incurred solely by reason of such **Insured Person's** status as an **Executive** or **Employee** of an **Organization**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

***END 021***

106831 (9/10)                                1

**ENDORSEMENT# *22***

This endorsement, effective *12:01 am*      *March 4, 2017*              forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**LOSS AMENDED
APPLICABLE LAW**

In consideration of the premium charged, it is hereby understood and agreed that Clause
13. DEFINITIONS is amended by adding the following to the end of the second paragraph
of the definition of **Loss**:

Applicable law shall include, but not be limited to, the address or place of domicile
of the **Insurer**, any **Organization's** place of domicile, the address of the **Named
Entity** or of any other **Organization** involved in the **Claim**, or the place of residence
of any **Insured Person** involved in the **Claim**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
***END 022***

108597 (4/11)                    1

**ENDORSEMENT#** *23*

This endorsement, effective *12:01 am*    *March 4, 2017*    forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**LOSS AMENDED
CLEANUP COSTS**

In consideration of the premium charged, it is hereby understood and agreed that Clause
13. DEFINITIONS is amended by deleting subparagraph (5) of the first paragraph of the
definition of **Loss** and replacing it with the following:

    (5) cleanup costs relating to hazardous materials, pollution or product defects
    that result in the release of hazardous materials or pollutants;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 023*

106832 (9/10)    1

**ENDORSEMENT#** *24*

This endorsement, effective *12:01 am*    *March 4, 2017*        forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**LOSS AMENDED**
**DELETE COURT ORDER WORDING**

In consideration of the premium charged, it is hereby understood and agreed that Clause
13. DEFINITIONS is amended by deleting the last sentence of the first paragraph of the
definition of **Loss** and replacing it with the following:

> Notwithstanding the foregoing subparagraph (7), the **Insurer** shall not assert that, in
> a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act
> of 1933, as amended, the portion of any amounts incurred by **Insureds** which is
> attributable to such violations constitutes uninsurable loss and shall treat that
> portion of all such settlements, judgments and **Defense Costs** as constituting **Loss**
> under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊕ All rights reserved.
*END 024*

ENDORSEMENT# *25*

This endorsement, effective *12:01 am    March 4, 2017*          forms a part of
policy number  *01-277-10-42*
issued to *T3 MOTION, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## M&A SEPARATE RETENTION ENDORSEMENT

In consideration of the premium charged herein, it is understood and agreed that the policy
is amended as follows:

1. Item 5. RETENTION of the Declarations is deleted in its entirety and replaced with the
following:

| 5. | RETENTION: Not applicable to: (i) **Non-Indemnifiable Loss**, (ii) **Crisis Loss** or (iii) **Derivative Investigation Costs**. | | |
|---|---|---|---|
| (a) | **Securities Retention:**  *$250,000* | (b) | **Employment Practices Retention:**  *$250,000* |
| (c) | **M&A Retention:**  *$1,000,000* | 4(d) | All other **Loss** to which a Retention applies:  *$250,000* |

If the **Organizations** fail or refuse to satisfy an applicable Retention, this policy shall
advance the **Loss** of an **Insured Person** pursuant to the ADVANCEMENT Clause.

2. For purposes of this endorsement, **"M&A Retention"** means the Retention applicable to
**Loss** (including **Pre-Claim Inquiry Costs**) in connection with a **Claim** or **Pre-Claim Inquiry**
alleging, arising out of, based upon, attributable to, arising from, or in consequence of
any proposed or actual merger, acquisition or consolidation to which an **Organization** is
a potential or actual party.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 025*

### ENDORSEMENT# *26*

This endorsement, effective *12:01 am     March 4, 2017*          forms a part of
policy number  *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NOTICE AND REPORTING AMENDED
90-DAY POST POLICY REPORTING PERIOD**

In consideration of the premium charged, it is hereby understood and agreed that Clause
7.(a) *Reporting a Claim, Pre-Claim Inquiry or Crisis* is amended by deleting the last
sentence thereof and replacing it with the following:

> In all such events, notification must be provided no later than 90 days after the end
> of the **Policy Period** or the **Discovery Period** (if applicable).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
**END 026**

108598 (4/11)                    1

**ENDORSEMENT#** *27*

This endorsement, effective *12:01 am*    *March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### WITH EXCEPTION FOR NON-INDEMNIFIABLE LOSS

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

A.    alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**, including but not limited to:

   (1)   **Nuclear Material** located at any **Nuclear Facility** owned by, or operated by or on behalf of, the **Organization**, or discharged or dispersed therefrom;

   (2)   **Nuclear Material** contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the **Organization**;

   (3)   the furnishing by an **Insured** or the **Organization** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **Nuclear Facility**; or

   (4)   **Claims** for damage or other injury to the **Organization** or its shareholders which allege, arise from, are based upon, are attributed to or in any way involve, directly or indirectly, the **Hazardous Properties** of **Nuclear Material**; or

B.    (1)   which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its limit of liability; or

   (2)   with respect to which: (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **Insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

Notwithstanding the foregoing, this exclusion shall not apply to **Non-Indemnifiable Loss**, other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**.

As used in this endorsement:

"**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**, **Hazardous Properties** and **Waste**.

◊ All rights reserved.
*END 027*

ENDORSEMENT# *27*    (continued)

"**Hazardous Properties**" include radioactive, toxic or explosive properties.

"**Nuclear facility**" means:

(a)    any nuclear reactor;

(b)    any equipment or device designed or used for:
  (1)    separating the isotopes of uranium or plutonium,
  (2)    processing or utilizing spent fuel, or
  (3)    handling, processing or packaging wastes;

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; and

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"**Nuclear Material**" means source material, special nuclear material or byproduct material.

"**Nuclear Reactor**" means any apparatus designed or used to sustain nuclear fission in a self- supporting chain reaction or to contain a critical mass of fissionable material.

"**Source Material**," "**Special Nuclear Material**," and "**Byproduct Material**" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"**Spent Fuel**" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor.

"**Waste**" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any **Nuclear Facility** included within the definition of nuclear facility under paragraph (a) or (b) thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

⦿ All rights reserved.
*END 027*

**ENDORSEMENT# *28***

This endorsement, effective at *12:01 am    March 4, 2017*        forms a part of
Policy number *01-277-10-42*
Issued to:*T3 MOTION, INC.*

By:    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## OTHER INSURANCE AND INDEMNIFICATION AMENDED
## DELETE ANTI-STACKING

In consideration of the premium charged, it is hereby understood and agreed that Clause 12.A.2. *Other Insurance and Indemnification* is amended by deleting the third paragraph thereof and replacing it with the following:

In the event of a **Claim** made against an **Outside Entity Executive**, coverage as is afforded by this policy, whether under the *Insured Person Coverage* or the *Indemnification Of Insured Person Coverage*, shall be specifically excess of: (a) any indemnification provided by an **Outside Entity**; and (b) any insurance coverage afforded to an **Outside Entity** or its **Executives** applicable to such **Claim**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 028*

108600 (4/11)                    Page 1 of 1

ENDORSEMENT# *29*

This endorsement, effective at *12:01 am*    *March 4, 2017*    forms a part of
Policy number  *01-277-10-42*
Issued to *T3 MOTION, INC.*

By    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## P&P LITIGATION EXCLUSION AMENDED
## INSURED PARTY

In consideration of the premium charged, it is hereby understood and agreed that Clause
4.B.(2) *Pending & Prior Litigation Exclusion* is deleted in its entirety and replaced with the
following:

(2) *Pending & Prior Litigation*

    (i)  alleging, arising out of, based upon or attributable to, as of
the **Continuity Date**, any pending or prior:
(a) litigation; or
(b) administrative or regulatory proceeding or investigation;
of which any **Insured** had notice and to which an **Insured** is
or was a party or a reasonable person would suspect that
an **Insured** may become a party; or

    (ii) alleging or derived from the same or essentially the same
facts as alleged in such pending or prior litigation or
administrative or regulatory proceeding or investigation as
described in subparagraph (i) above;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 029*

107191 (11/10)                    Page 1 of 1

ENDORSEMENT# *30*

This endorsement, effective *12:01 am    March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**PERSONAL INJURY EXCLUSION AMENDED
UK CORPORATE MANSLAUGHTER ACT DEFENSE COSTS CARVEBACK**

In consideration of the premium charged, it is hereby understood and agreed that Clause 4.B.(3) *Personal Injury Exclusion* shall not apply to **UK Corporate Manslaughter Act Defense Costs.**

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
**END 030**

<u>ENDORSEMENT#</u> *31*

This endorsement, effective *12:01 am*     *March 4, 2017*     forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PERSONAL REPUTATION EXPENSES AMENDED
## SAME EVENTS

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting the second sentence in the definition of **"Personal Reputation Expenses"** in its entirety and replacing it with the following:

> **"Personal Reputation Expenses"** shall not include any fees, costs or expenses of any **Crisis Firm** incurred by an **Executive** if such **Crisis Firm** is also retained by or on behalf of an **Organization** in connection with the same events underlying the **Personal Reputation Crisis**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

⊚ All rights reserved.

*END 031*

106817 (9/10)                    1

ENDORSEMENT# *32*

This endorsement, effective *12:01 am*    *March 4, 2017*        forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PRE-CLAIM INQUIRY AMENDED
### CHANGE "AND" TO "OR"

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting subparagraph (1)(ii)(B) of the definition of **Pre-Claim Inquiry** in its entirety and replacing it with the following:

    (B) as part of its **Derivative Investigation**; or


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
### END 032

<u>ENDORSEMENT#</u> *33*

This endorsement, effective *12:01 am*      *March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## PRE-CLAIM INQUIRY AMENDED
## COST OF PRODUCING DOCUMENTS

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting the definition of "**Pre-Claim Inquiry Costs**" in its entirety and replacing it with the following:

| | |
|---|---|
| **Pre-Claim Inquiry Costs** | means the reasonable and necessary pre-**Claim** fees, costs and expenses consented to by the **Insurer** and incurred by an **Insured Person** solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** directed to such **Insured Person**, including attendance at an interview or meeting requested by an **Enforcement Body** and the cost of such **Insured Person** in producing documents in his or her possession, but excluding any compensation of any **Insured Person**. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 033*

106819 (9/10)                          1

ENDORSEMENT# *34*

This endorsement, effective *12:01 am*      *March 4, 2017*          forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PRIOR ACTS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** alleging any **Wrongful Act** occurring prior to *November 17, 2014* or after the end of the **Policy Period**. This policy only provides coverage for **Wrongful Acts** occurring on or after *November 17, 2014* and prior to the end of the **Policy Period** and otherwise covered by this policy. **Loss** arising out of the same or related **Wrongful Act** shall be deemed to arise from the first  such same or related **Wrongful Act**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 034*

104139 (4/10)                    1

**ENDORSEMENT#** *35*

This endorsement, effective *12:01 am*   *March 4, 2017*      forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PROFESSIONAL ERRORS & OMISSIONS EXCLUSION
### (WITH SECURITIES CLAIM CARVE-OUT)

In consideration of the premium charged, it is hereby understood and agreed that the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to the **Organization's** or any **Insured's** performance of or failure to perform professional services for others, or any acts, errors or omissions relating thereto.

Notwithstanding the foregoing, it is further understood and agreed that this endorsement shall not apply to any **Securities Claim**, provided that such **Securities Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, the **Organization** or any **Insured**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

⊕ All rights reserved.

*END 035*

104141 (4/10)                    1

**ENDORSEMENT#** *36*

This endorsement, effective *12:01 am      March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### RETENTION EROSION THROUGH SIDE-A INSURANCE FILL-IN

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.    The following paragraph is added to the end of Clause 5. RETENTION:

      If an **Organization** fails or refuses to advance, pay or indemnify covered
      **Indemnifiable Loss** of an **Insured Person** within an applicable Retention, then solely
      to the extent an insurer agrees to pay or pays such **Loss** pursuant to the terms and
      conditions of a Side A-Excess DIC Insurance Policy, the **Insurer** shall recognize that
      the **Side A-Excess DIC Insurance Policy** payments erode (contribute to and reduce)
      the applicable Retention amount.

2.    As a precondition to such recognition of the erosion of the Retention amount, an
      **Insured** shall provide the **Insurer** with written proof, to the **Insurer's** satisfaction, of
      the payment of such **Loss** under the **Side A-Excess DIC Insurance Policy**.

3.    Advancement, payment or indemnification of an **Insured Person** by an **Organization**
      is deemed "failed" if it has been requested by an **Insured Person** in writing and has
      not been provided by, agreed to be provided by or acknowledged as an obligation
      by an **Organization** within 60 days of such request; and advancement, payment or
      indemnification by an **Organization** is deemed "refused" if an **Organization** gives a
      written notice of the refusal to the **Insured Person**. Advancement, payment or
      indemnification of an **Insured Person** by an **Organization** shall only be deemed
      "failed" or "refused" to the extent such advancement, payment or indemnification is
      not provided, or agreed to be provided, or acknowledged by and collectible from an
      **Organization**.

4.    "**Side A-Excess DIC Insurance Policy**" means any insurance policy written
      specifically as excess over this policy that provides "Side A" (non-indemnifiable or
      non-indemnified loss) coverage with difference-in-conditions features.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◈ All rights reserved.
*END 036*

**ENDORSEMENT#** *37*

This endorsement, effective *12:01 am    March 4, 2017*    forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**SECURITIES CLAIM DEFINITION - COMMON LAW**

In consideration of the premium charged, it is hereby understood and agreed that the policy's definition of **"Securities Claim,"** is deleted in its entirety and replaced with the following:

**"Securities Claim"** means a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured**:

(1)    alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:

    (a)    brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or

    (b)    brought by a security holder or purchaser or seller of securities of an **Organization** with respect to such security holder's, purchaser's or seller's interest in securities of such **Organization**; or

(2)    which is a **Derivative Suit**.

Notwithstanding the foregoing, the term **"Securities Claim"** shall:

(1)    include an administrative or regulatory proceeding against an **Organization** that meets the requirements of subparagraph (1) above, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**; and

(2)    not include any **Claim** brought by any **Executive** or **Employee** of an **Organization** alleging, arising out of, based upon or attributable to the loss of, or failure to receive or obtain, the benefit of stock, stock warrants, stock options or other securities of an **Organization**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 037*

104962 (4/10)    Page 1 of 1

**ENDORSEMENT#** *38*

This endorsement, effective *12:01 am      March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SEVERABILITY OF EXCLUSIONS AMENDED
### GC IMPUTATION EXCEPTION FOR TIMELY REMEDIAL ACTION

In consideration of the premium charged, it is hereby understood and agreed that Clause 4.A. *Full Severability of Exclusions For Insured Persons* is amended by adding the following to the end thereof:

> Provided, however, that the **Wrongful Acts** of, any past, present or future General Counsel shall not be imputed to an **Organization** if the General Counsel took timely corrective and/or remedial action upon learning of the **Wrongful Acts** upon which said exclusions are predicated.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 038*

106823 (9/10)                                1

**ENDORSEMENT#** *39*

This endorsement, effective *12:01 am*    *March 4, 2017*    forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### SEVERABILITY OF THE APPLICATION AMENDED
### (ADVANCEMENT)

In consideration of the premium charged, it is hereby understood and agreed that the following paragraph is added to Clause 11.D. *Severability of the Application* at the end thereof:

Solely with respect to this *Severability of the Application Clause*, the **Insurer** agrees to advance payments of **Loss** unless and until an order by a court of competent jurisdiction provides either that such advancement is not required or that coverage is void *ab initio*, subject to the condition that such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Organization** as soon as reasonably practicable after an order provides that such advancement is not required or that coverage is void *ab initio*. Clause 12.F.1. *ALTERNATIVE DISPUTE RESOLUTION* of this policy shall not apply to this paragraph.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 039*

**ENDORSEMENT#** *40*

This endorsement, effective *12:01 am*      *March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SOX 304 COSTS AMENDATORY

In consideration of the premium charged, it is hereby understood and agreed that Clause 13. DEFINITIONS is amended by deleting the definition of **"SOX 304 Costs"** in its entirety and replacing it with the following:

**SOX 304 Costs**        means the reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including the premium or origination fee for a loan or bond) and incurred by the chief executive officer or chief financial officer of the **Named Entity** to facilitate the return of amounts required to be repaid by such **Executive** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002. **SOX 304 Costs** provided by this coverage extension do not include the payment, return, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Executive** pursuant to Section 304(a).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 040*

**ENDORSEMENT# 41**

This endorsement, effective  *12:01 am*       *March 4, 2017*       forms a part of
policy number  *01-277-10-42*
issued to   *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**SPECIFIC ENTITY EXCLUSION (Claims brought by and made against)**

In consideration of the premium charged, it is hereby understood and agreed that the
**Insurer** shall not be liable for any **Loss** in connection with any **Claim** (i) made against any
entity(ies) listed below and/or any **Executive** or **Employee** thereof; or (ii) brought by or on
behalf of any entity(ies) listed below and/or any **Executives** thereof; or by any security
holder of the **Organization** whether directly or derivatively, unless such **Claim** is instigated
and continued totally independent of, or without the intervention of such entity(ies) and/or
any **Executives** thereof:

1. Prominent Stage Investments Limited (including any subsidiary or affiliate thereof)

2. Business Wise Global Limited (including any subsidiary or affiliate thereof)

3. Esteemed Pioneer Limited (including any subsidiary or affiliate thereof)

4. Northside Ventures Limited (including any subsidiary or affiliate thereof)

5. Perfect Harmony Limited (including any subsidiary or affiliate thereof)

6. Campo Group Limited (including any subsidiary or affiliate thereof)

7. Portswealth Holdings Limited (including any subsidiary or affiliate thereof)

8. Suzhou Capital Advisors, LLC (including any subsidiary or affiliate thereof)

9. Elite Horse Investments Limited (including any subsidiary or affiliate thereof)

10. Expert Asia Investment Limited (including any subsidiary or affiliate thereof)

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

M116336                                    *END 41*

### ENDORSEMENT# *42*

This endorsement, effective *12:01 am    March 4, 2017*        forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT
## OR ACT EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that, without limiting the effectiveness of Clause 4. EXCLUSIONS, Exclusion (2) of the policy, the **Insurer** shall not be liable to make any payment for **Loss** in connection with: (i) any of the **Claim(s)**, notices, events, investigations or actions listed under EVENTS below (hereinafter "**Events**"); (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) any **Event(s)**; or (b) any **Claim(s)** arising from any **Event(s)**; or (iii) any **Wrongful Act**, underlying facts, circumstances, acts or omissions in any way relating to any  **Event(s)**.

<u>EVENTS</u>

*1. ELITE HORSE INVESTMENTS LTD v. T3 MOTION, INC*

*2. C.A. NO. 10550-CB*

It is further understood and agreed that the **Insurer** shall not be liable for any **Loss** in connection with:

(A)    any restatement, retraction, amendment or revision of in part or in whole:

    (i)    any document or statement filed or submitted or required to be filed or submitted with the Securities and Exchange Commission or any other similar federal, state or local agency (including but not limited to any 10K's, 10Q's or annual reports); or

    (ii)    any written or oral statement made regarding the assets, revenues, sales or financial condition of the **Organization,**

resulting from, arising out, based upon or attributable to any **Event** or the resolution of said **Events**; and

© All rights reserved.
### *END 042*

104143 (4/10)                1

ENDORSEMENT# *42*   (continued)

(B)  any **Claim** alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an **Interrelated Wrongful Act** (as that term is defined below), regardless of whether or not such **Claim** involved the same or different **Insureds**, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

For the purposes of this endorsement an **"Interrelated Wrongful Act"** means: (i) any fact, circumstance, act or omission alleged in any **Event(s)** and/or (ii) any **Wrongful Act** which is the same as, similar or related to or a repetition of any **Wrongful Act** alleged in any **Event(s)**.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.

***END 042***

104143 (4/10)                    2

**ENDORSEMENT#** *43*

This endorsement, effective *12:01 am    March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## SPOUSAL, DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION AMENDED TRUST OR ESTATE PLANNING VEHICLE

In consideration of the premium charged, it is hereby understood and agreed that Clause 12.G. *Spousal, Domestic Partner And Legal Representative Extension* is deleted in its entirety and replaced with the following:

### G. *Spousal, Domestic Partner And Legal Representative Extension*

If a **Claim** against an **Insured Person** includes a **Claim** against: (i) the lawful spouse or legally recognized domestic partner of such **Insured Person**; or (ii) a property interest of such spouse or domestic partner, and such **Claim** arises from any actual or alleged **Wrongful Act** of such **Insured Person**, this policy shall pay covered **Loss** arising from the **Claim** made against such spouse or domestic partner or the property of such spouse or domestic partner to the extent that such **Loss** does not arise from a **Claim** for any actual or alleged act, error or omission of such spouse or domestic partner. This policy shall pay covered **Loss** arising from a **Claim** made against the estates, heirs, or legal representatives of any deceased **Insured Person**, or any **Claim** against a trust or estate planning vehicle of an **Insured Person**, and the legal representatives of any **Insured Person** in the event of incompetence, insolvency or bankruptcy, who was an **Insured Person** at the time the **Wrongful Acts** upon which such **Claim** is based were alleged to have been committed.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 043*

107317 (11/10)                    1

### ENDORSEMENT# *44*

This endorsement, effective *12:01 am*      *March 4, 2017*        forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### STATE AMENDATORY INCONSISTENT

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.  In the event that there is an inconsistency between any: (a) state amendatory attached to this policy, or any other wording attached to this policy to comply with applicable law; and (b) any other term, condition or limitation of this policy; then, to the extent permitted by law, subject to the limitations below, the Insurer will resolve the inconsistency by applying the terms, conditions or limitations that are more favorable to the policyholder.

2.  This endorsement shall not apply to the extent that: (a) any state amendatory or other wording expressly limits coverage in order to comply with applicable law, or (b) any such amendatory or other compliance wording amends language applicable to premium. In such events, the state amendatory or other compliance wording will govern over any other term, condition or limitation of the policy.

3.  "Policyholder" means the first Named Entity, Named Organization, Named Corporation, Named Sponsor, Named Insured or other policyholder designated in Item 1 of the Declarations of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 044*

94039 (5/07)                     Page 1 of 1

**ENDORSEMENT#** *45*

This endorsement, effective *12:01 am      March 4, 2017*          forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**SUBSIDIARY ADDITIONS AMENDED**
**90-DAY AUTO-SUBSIDIARY PERIOD**

In consideration of the premium charged, it is hereby understood and agreed that Clause
10.B. *Subsidiary Additions* is amended by deleting subparagraph (2) in its entirety and
replacing it with the following:

> (2) 25% or more of those total consolidated assets, but such entity shall be a
> **"Subsidiary"** only: (i) for a period of ninety (90) days from the date the **Named
> Entity** first had **Management Control** of such entity; or (ii) until the end of the
> **Policy Period**, whichever expires or ends first (the **"Auto-Subsidiary Period"**);

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

Ⓟ All rights reserved.
*END 045*

108586 (4/11)                    1

**ENDORSEMENT#** *46*

This endorsement, effective *12:01 am*     *March 4, 2017*        forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**TRANSACTION AMENDED**
**DELETE SUBPARAGRAPH (3)**

In consideration of the premium charged, it is hereby understood and agreed that Clause
13. DEFINITIONS is amended by deleting the definition of **Transaction** and replacing it with
the following:

**Transaction**            means:

(1) the **Named Entity** consolidating with or merging into another
entity such that the **Named Entity** is not the surviving entity,
or selling all or substantially all of its assets to any other
person or entity or group of persons or entities acting in
concert; or

(2) any person or entity or group of persons or entities acting in
concert acquiring **Management Control** of the **Named Entity**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 046*

106010 (7/10)                    1

**ENDORSEMENT#** *47*

This endorsement, effective *12:01 am     March 4, 2017*          forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

## UK CORPORATE MANSLAUGHTER ACT DEFENSE COSTS AMENDED
## OTHER LAW

In consideration of the premium charged, it is hereby understood and agreed that Clause
13. DEFINITIONS is amended by deleting the definition of **"UK Corporate Manslaughter Act
Defense Costs"** in its entirety and replacing it with the following:

| | |
|---|---|
| **UK Corporate Manslaughter Act Defense Costs** | means **Defense Costs** incurred by an **Insured Person** that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Organization** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute or other law in any jurisdiction. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

◊ All rights reserved.
*END 047*

106828 (9/10)                                    1

**ENDORSEMENT# *48***

This endorsement, effective *12:01 am      March 4, 2017*                    forms a part of
policy number    *01-277-10-42*
issued to *T3 MOTION, INC.*


by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 104122 | 04/10 | D&O ADMITTED DEC |
| 96555 | 01/15 | TRIA DEC DISCLOSURE FORM |
| 104123 | 04/10 | D&O ADMITTED GUTS |
| 104870 | 04/10 | CRISISFUND APPENDIX |
| 52133 | 03/07 | CALIFORNIA AMENDATORY - CANCELLATION/NONRENEWAL |
| 108587 | 04/11 | ADVANCEMENT AMENDED NOT IN DEFAULT OF PAYMENT RETURN OF PAYMENTS |
| 113730 | 03/13 | ALLOCATION AMENDED (ADD REASONABLY) |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| 104124 | 04/10 | ALTERNATIVE DISPUTE RESOLUTION PROCESS (WAITING PERIOD AMENDED) |
| 116295 | 03/15 | CLASS CERTIFICATION EVENT STUDY EXPENSES (REMOVES ADMISSIBLE TRIGGER) |
| 106827 | 09/10 | APPLICATION AMENDED UNDERWRITING OF THIS POLICY WRITTEN REPRESENTATIONS AND PUBLIC FILINGS |
| 107032 | 10/10 | APPLICATION AND UNDERWRITING AMENDED KNOWLEDGE REVISIONS |
| 107033 | 10/10 | APPLICATION AND UNDERWRITING AMENDED RELIANCE AND INCORPORATION |
| 106012 | 07/10 | BANKRUPTCY WAIVER ADDED |
| 104126 | 04/10 | CAPTIVE INSURANCE COMPANY EXCLUSION |
| 115281 | 05/13 | CLAIM DEFINITION AMENDED (REQUEST TO TOLL STATUTE OF LIMITATIONS) |
| 104930 | 04/10 | COMMISSIONS EXCLUSION |
| 113731 | 03/13 | CONDUCT EXCLUSIONS AMENDED (FINAL, NON-APPEALABLE ADJUDICATION IN ANY UNDERLYING PROCEEDING PERSONAL PROFIT AND FINANCIAL ADVANTAGE) |
| 104934 | 04/10 | CRISISPLUS ENDORSEMENT |
| 108594 | 04/11 | DERIVATIVE INVESTIGATION COSTS AMENDED |
| 106006 | 07/10 | DISCOVERY CLAUSE AMENDED DELETE OR REPLACED |

Ⓡ All rights reserved.

*END 048*

78859 (10/01)                     Page 1  of 3

**ENDORSEMENT# *48***

This endorsement, effective *12:01 am*      *March 4, 2017*            forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 115283 | 05/13 | DODD-FRANK 954 COSTS ADDED |
| 115284 | 05/13 | ENTITY V. INSURED EXCLUSION AMENDED (PARA B INAPPLICABLE TO FORMER EXECS 3 YRS REMOVED, CARVEBACK C FOR BANKRUPTCY CONSTITUENCIES, DIP CLAIMS AGAINST FORMER INSUREDS, FOREIGN JURISDICTION, SOX 304 & DODD FRANK 954 COSTS CARVEBACKS, WHISTLEBLOWER SUBPOENA) |
| 106829 | 09/10 | EXTRADITION AMENDED SOUGHT TO BE SURRENDERED |
| 106831 | 09/10 | LIBERTY PROTECTION COSTS AMENDED DELETE NO CLAIM MADE OR PRE CLAIM INQUIRY KNOWN REQUIREMENT |
| 108597 | 04/11 | LOSS AMENDED APPLICABLE LAW |
| 106832 | 09/10 | LOSS AMENDED CLEANUP COSTS |
| 106816 | 09/10 | LOSS AMENDED DELETE COURT ORDER WORDING |
| 110922 | 03/12 | M&A SEPARATE RETENTION ENDORSEMENT |
| 108598 | 04/11 | NOTICE AND REPORTING AMENDED 90-DAY POST POLICY REPORTING PERIOD |
| 104948 | 04/10 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT WITH EXCEPTION FOR NON-INDEMNIFIABLE LOSS |
| 108600 | 04/11 | OTHER INSURANCE AND INDEMNIFICATION AMENDED DELETE ANTI STACKING |
| 107191 | 11/10 | P&P LITIGATION EXCLUSION AMENDED INSURED PARTY |
| 108603 | 04/11 | PERSONAL INJURY EXCLUSION AMENDED UK CORPORATE MANSLAUGHTER ACT DEFENSE COSTS CARVEBACK |
| 106817 | 09/10 | PERSONAL REPUTATION EXPENSES AMENDED SAME EVENTS |
| 108604 | 04/11 | PRE-CLAIM INQUIRY AMENDED CHANGE AND TO OR |
| 106819 | 09/10 | PRE-CLAIM INQUIRY AMENDED COST OF PRODUCING DOCUMENTS |
| 104139 | 04/10 | PRIOR ACTS EXCLUSION |
| 104141 | 04/10 | PROFESSIONAL ERRORS & OMISSIONS EXCLUSION (WITH SECURITIES CLAIM CARVE-OUT) |
| 104959 | 04/10 | RETENTION EROSION THROUGH SIDE-A INSURANCE FILL-IN |

**✿**

***END 048***

### ENDORSEMENT# 48

This endorsement, effective *12:01 am*      *March 4, 2017*                    forms a part of
policy number   *01-277-10-42*
issued to *T3 MOTION, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 104962 | 04/10 | SECURITIES CLAIM DEFINITION - COMMON LAW |
| 106823 | 09/10 | SEVERABILITY OF EXCLUSIONS AMENDED GC IMPUTATION EXCEPTION FOR TIMELY REMEDIAL ACTION |
| 105000 | 04/10 | SEVERABILITY OF THE APPLICATION AMENDED (ADVANCEMENT) |
| 106822 | 09/10 | SOX 304 COSTS AMENDATORY |
| M116336 | | SPECIFIC ENTITY EXCLUSION (Claims brought by and made against) |
| 104143 | 04/10 | SPECIFIC INVESTIGATION CLAIMS LITIGATION EVENT OR ACT EXCLUSION |
| 107317 | 11/10 | SPOUSAL DOMESTIC PARTNER AND LEGAL REPRESENTATIVE EXTENSION AMENDED TRUST OR ESTATE PLANNING VEHICLE |
| 94039 | 05/07 | STATE AMENDATORY INCONSISTENT |
| 108586 | 04/11 | SUBSIDIARY ADDITIONS AMENDED 90-DAY AUTO-SUB PERIOD |
| 106010 | 07/10 | TRANSACTION AMENDED DELETE SUBPARAGRAPH (3) |
| 106828 | 09/10 | UK CORPORATE MANSLAUGHTER ACT DEFENSE COSTS AMENDED OTHER LAW |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 048*

AIG

## CLAIM REPORTING FORM

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number: _01-277-10-42_      Date: _____

Type of Coverage: D&O _____ E&O _____ Fidelity _____ (complete the Fidelity Supplemental on
the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*T3 MOTION, INC.*

_____

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____-_____Ext _____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state
relationship:

_____

Insurance Broker/Agent: *HUB INTERNATIONAL INSURANCE SERVICES INC.*

Address: *1903 WRIGHT PLACE, SUITE 280*

Address: *CARLSBAD, CA 92008*

Contact: *Chris Colton*                    Phone:_____

eMail: *chris.colton@hubinternational.com*

Send Notice of Claims to:      AIG                    Phone: (888) 602-5246
                               Financial Lines Claims  Fax:   (866) 227-1750
                               P.O. Box 25947          Email: c-Claim@AIG.com
                               Shawnee Mission, KS 66225

AIG

# CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL
**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Reported under Policy/Bond Number: _01-277-10-42_

Date of Discovery: _____    Estimated Amount of loss: _____

Cause of Loss:    Employee Dishonesty  _____    Computer Fraud  _____

Funds Transfer  _____    Robbery/Burglary  _____

ID Theft  _____    Forgery  _____

Client Property  _____    In Transit  _____

ERISA  _____    Credit Card Forgery  _____

Other  _____    if Other, describe: _____

Send Notice Of Claims To:    AIG    Phone: (888) 602-5246
Financial Lines Claims    Fax:   (866) 227-1750
P.O. Box 25947    Email: c-Claim@AIG.com
Shawnee Mission, KS 66225

*centralized Customer Link and Information Management*

**EXHIBIT "B"**

**LENDER:**

450 Skokie Blvd, Ste 1000

# FIRST INSURANCE
## OF CALIFORNIA — FUNDING
### A WINTRUST Company

## COMMERCIAL
## PREMIUM FINANCE AGREEMENT

Northbrook, IL 60062-7917
P:(800) 837-2511 F:(800) 837-3709
www.firstinsurancefunding.com

**Quote #: 10463925**

| INSURED/BORROWER | Customer ID: N/A | AGENT or BROKER |
|---|---|---|
| (Name and Address as shown on Policy) | | (Name and Business Address) |
| T3 Motion, Inc. | | HUB INTERNATIONAL INSURANCE SERVICES INC |
| 5181 Edison Avenue | | 5405 Morehouse Dr., Suite 340 |
| Chino, CA 91710 | | SAN DIEGO, CA 92121 |

## LOAN DISCLOSURE

| Total Premiums, Taxes and Fees | Cash Down Payment | Unpaid Premium Balance | Documentary Stamp Tax (only applicable in Florida) | Amount Financed (amount of credit provided on your behalf) | FINANCE CHARGE (dollar amount the credit will cost you) | Total of Payments (amount paid after making all scheduled payments) | ANNUAL PERCENTAGE RATE (cost of credit as a yearly rate) |
|---|---|---|---|---|---|---|---|
| 249,161.52 | 38,011.73 | 211,149.79 | 0.00 | 211,149.79 | 5,804.48 | 216,954.27 | 6.550 % |

### YOUR PAYMENT SCHEDULE WILL BE:    Mail Payments to: FIRST Insurance Funding Corp., PO Box 7000, Carol Stream, IL 60197-7000

| Number of Payments | Amount of Each Payment | First Installment Due | 04/04/2017 |
|---|---|---|---|
| 9 | 24,106.03 | Installment Due Dates | 4th (Monthly) |

**SECURITY INTEREST.** INSURED/BORROWER ("Insured") grants and assigns LENDER a security interest in the financed policies and any additional premiums required under the financed policies, including (but only to the extent permitted by applicable law) all return premiums, dividend payments (not applicable in KY), and loss payments which reduce unearned premium, subject to any mortgagee or loss payee interest. If any circumstances exist in which premiums related to any financed policy could become fully earned in the event of loss, LENDER shall be named a loss-payee with respect to such policy.

**FINANCE CHARGE.** The finance charge begins accruing on the earliest effective date of the policies listed in the Schedule of Policies. The finance charge may include a nonrefundable service charge equal to the maximum amount permitted by law($10 in AK, DE, NY & PA; $25 in NV; $12 in NJ; $15 in NC, RI & VA; $16 in MA; $20 in FL). The finance charge is computed using a 365-day calendar year.

**LATE PAYMENT.** A late charge will be assessed on any installment at least 5 days in default (7 days in VA; 10 days in MA & TX; or later date as required by law.). This late charge will equal 5% of the delinquent installment or the maximum late charge permitted by law, whichever is less (greater of $10 or 5% in FL; greater of $25 or 1.5% in NJ; $5 maximum in DE, MT and ND; $100 maximum in MD; 5% in VA).

**PREPAYMENT.** Insured is entitled to a refund of the unearned finance charge if the loan is prepaid in full. The refund shall be computed according to applicable law. In VA the refund shall be calculated using the short rate method. In CA the rebate is in compliance with Cal Fin Code § 18629.

## SCHEDULE OF POLICIES

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| SP878172 | C00438-EVANSTON INSURANCE COMPANY | CGL | 12 | 03/04/2017 | 50,610.00 |
| | G00217-SWETT & CRAWFORD | | | ERN TXS/FEES | 0.00 |
| | [ME:25.000 %, CX:0]      [AU, PR] | | | FIN TXS/FEES | 1,619.52 |
| 01000332642 | C00515-KINSALE INSURANCE COMPANY | EXLB | 12 | 03/04/2017 | 30,000.00 |
| | G00217-SWETT & CRAWFORD | | | ERN TXS/FEES | 750.00 |
| | [ME:25.000 %, CX:0]      [PR] | | | FIN TXS/FEES | 960.00 |
| **(Policies continued on next page.)** | | | | **TOTAL** | 249,161.52 |

Q# 10463925, PRN: 030617, CFG: HUB-PACIFIC, RT: HUBPACIFIC-30, DD: 30, BM: Invoice, Qtd For: A01083 Original, Memo 0

**INSURED'S AGREEMENT:**

**1.** In consideration of the premium payment by LENDER to the insurance companies listed in the Schedule of Policies, their representative or the Agent or Broker listed above, Insured promises to pay, to the order of LENDER, the Total of Payments subject to all of the provisions of this Agreement.

**2. POWER OF ATTORNEY.** INSURED IRREVOCABLY APPOINTS LENDER AS ITS "ATTORNEY-IN-FACT" with full power of substitution and full authority, in the event of default under this Agreement, to (i) cancel the financed policies in accordance with the provisions contained herein, (ii) receive all sums assigned to LENDER, and (iii) execute and deliver on behalf of Insured all documents relating to the insurance policies listed on the Schedule of Policies ("Financed Policies") in furtherance of this Agreement (clauses (ii) and (iii) are not applicable in Florida). This right to cancel will terminate only after Insured's indebtedness under this Agreement is paid in full.

**3. SIGNATURE & ACKNOWLEDGEMENT.** Insured has signed and received a copy of this Agreement. If Insured is not an individual, the undersigned is authorized to sign this Agreement on behalf of Insured. All named Insured(s), jointly and severally if more than one, agree to all provisions set forth in this Agreement. **Insured acknowledges and understands that entry into this financing arrangement is not required as a condition for obtaining insurance coverage.**

**NOTICE TO INSURED:** (1) Do not sign this Agreement before you read both pages of it, or if it contains any blank space. (2) You are entitled to a completely filled-in copy of this Agreement. (3) Under the law, you have the right to pay off in advance the full amount due and under certain conditions to receive a partial refund of the finance charge. (4) Keep a copy of this Agreement to protect your legal rights. (5) See last page of Agreement for your consent to electronic statement and notice delivery.

**4. EFFECTIVE DATE.** This Agreement will not become effective until it is accepted in writing by LENDER.

| | | | |
|---|---|---|---|
| _____ | 3/7/2017 | _____ | _____ |
| Signature of Insured or Authorized Agent | Date | Signature of Agent | Date |
| FEIN or SSN   XX-XXX7549 | | **The undersigned hereby warrants and agrees to the Agent or Broker Representations and Warranties set forth herein.** | |

FIF0216P

Insured: T3 Motion, Inc.

## ADDITIONAL PROVISIONS OF PREMIUM FINANCE AGREEMENT

Quote #: 10463925

**5. DEFAULT/CANCELLATION.** Insured is in default under this Agreement if (a) a payment is not received by LENDER when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against Insured, or (c) Insured fails to comply with any of the terms of this Agreement; provided, however, when required by law, Insured may be deemed in default only under clause (a) above. Clauses (b) and (c) are not applicable in FL, MD, NV, NC or VA. At any time after default, LENDER can demand and has the right to receive immediate payment of the total unpaid amount due under this Agreement even if LENDER has not received any refund of unearned premium. If Insured is in default, LENDER has no further obligation under this Agreement to pay premiums on Insured's behalf, and LENDER may pursue any of the remedies provided in this Agreement or by law. If a default by Insured results in cancellation of the Financed Policies, Insured agrees to pay a cancellation charge where allowed by law (not permitted in AK, FL, KS, KY, NV, NY, NC, PA, SC, TX or VA). If cancellation or default occurs, where permitted by law, Insured agrees to pay LENDER interest on the balance due at the contract rate or at the maximum lawful rate, whichever is less, until the balance is paid in full or until such other date as provided by law.

**6. LIMITATION OF LIABILITY. Insured understands and agrees that LENDER or its assignee is not liable for any losses or damages to Insured or any person or entity upon the exercise of LENDER's right of cancellation, except in the event of willful or intentional misconduct by LENDER, except in KY.**

**7. RETURNED CHECK CHARGE.** If Insured's check is dishonored for any reason and if permitted by law, Insured will pay LENDER a returned check charge equal to the maximum fee permitted by law ($0 in KY; $15 in FL & NV; $20 in VA; maximum of $25 in MD).

**8. REINSTATEMENT.** Once a Notice of Cancellation has been sent to any insurance company, LENDER has no duty to ask that the Financed Policy be reinstated, even if LENDER later receives a payment from Insured. If LENDER requests reinstatement, such request does not guarantee coverage will be reinstated by the insurance company. Payments that LENDER receives after sending a Notice of Cancellation may be applied to Insured's account without changing any of LENDER's rights under this Agreement.

**9. LENDER'S RIGHTS AFTER THE POLICIES ARE CANCELLED.** After any Financed Policy is cancelled by any party or if a credit is otherwise generated, LENDER has the right to receive all unearned premiums and other funds assigned to LENDER as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between Insured and LENDER (in VA, only to this Agreement). Receipt of unearned premiums does not constitute payment of installments to LENDER, in full or in part. Any amounts received by LENDER after cancellation will be credited to the balance due with any excess paid to Insured; the minimum refund is the greater of $1.00 or the minimum amount allowed by law (no minimum in VA). Any deficiency shall be immediately paid by Insured to LENDER. Insured agrees that insurance companies may rely exclusively on LENDER's representations about the financed policies.

**10. ASSIGNMENT.** Insured may not assign any Financed Policy without LENDER's written consent. LENDER may transfer its rights under this Agreement without the consent of Insured.

**11. AGENT OR BROKER.** Insured agrees that the Agent or Broker issuing the policies or through whom the policies were issued is not the agent of LENDER, except for any action taken on behalf of LENDER with the express authority of LENDER, and LENDER is not bound by anything the Agent or Broker represents to Insured, orally or in writing, that is not contained in this Agreement. The Agent or Broker may receive from LENDER $3,554.66 for aiding in the administration of this Agreement relating to the Financed Policies (not applicable in VA), and in NY the Agent or Broker may assess a fee to Insured for obtaining and servicing the Financed Policies pursuant to NY CLS Ins § 2119. Any questions regarding this payment should be directed to the Agent or Broker.

**12. COLLECTION COSTS.** Insured agrees to pay reasonable attorney fees, court costs, and other collection costs to LENDER to the extent permitted by law if this Agreement is referred to an attorney or collection agent who is not a salaried employee of LENDER to collect money that Insured owes (not permitted in KY or MD).

**13. GOVERNING LAW.** This Agreement is governed by and interpreted under the laws of the state where Insured resides, except for conflict of laws principles thereof. If any court finds any part of this Agreement to be invalid, such finding shall not affect the remaining provisions of this Agreement.

**14. WARRANTY OF ACCURACY.** Insured represents and warrants that to the best of its knowledge (i) the Financed Policies are in full force and effect and that Insured has not and will not assign any interest in the policies except for the interest of mortgagees and loss payees, (ii) that none of the Financed Policies are for personal, family or household purposes, (iii) the Cash Down Payment and any past due payments have been paid in full to the Agent or Broker in cash or other immediately available funds, (iv) all information provided herein or in connection with this Agreement is true, correct, complete and not misleading, (v) Insured is not insolvent nor presently involved in any insolvency proceeding, (vi) Insured has no indebtedness to the parties issuing the Financed Policies, and (vii) there is no provision in the Financed Policies that would require LENDER to notify or obtain consent from any other party to effect cancellation of such policies.

**15. ADDITIONAL PREMIUMS.** Insured agrees to fully and timely comply with all audits and pay to the insurance company any additional amount due in connection with the Financed Policies. The Amount Financed shall be applied to the Financed Policies' premium amounts and Insured shall be responsible for any additional premiums or other sums. Insured, or Agent/Broker, may request that LENDER finance additional policies and/or additional premium during the term of this Agreement, and if LENDER agrees, this Agreement shall be deemed amended accordingly. Should LENDER assign an account number to further extensions of credit, then a) this Agreement and loan documents identified by the assigned account number(s) shall be deemed to comprise a single and indivisible loan transaction, b) Insured shall irrevocably appoint LENDER as its attorney in fact in connection with additional amount financed, c) default under any component of the transaction shall constitute a default under the entire transaction, and d) unearned premium relating to any component of the transaction may be collected and applied to the entire loan transaction balance.

**16. CORRECTIONS.** LENDER may insert the names of the insurance companies and policy numbers, if this information is not known at the time Insured signs this Agreement. LENDER is authorized to correct patent errors or omissions in this Agreement (not applicable in KY or VA).

**17. NON-WAIVER.** Not Applicable.

**18. THIRD PARTY FEE.** Not Applicable.

---

Federal law requires all financial institutions to obtain, verify and record information that identifies each person or entity that is granted a loan. LENDER will require such information as LENDER deems reasonably necessary for proper identification, such as your name, street address, FEIN, SSN or date of birth. LENDER will use this information only to process this Agreement and will not share this information with outside parties except to the extent necessary to complete this transaction.

## AGENT OR BROKER REPRESENTATIONS AND WARRANTIES

Unless previously disclosed in writing to LENDER or specified in the Schedule of Policies, the Agent or Broker executing this Agreement expressly represents, warrants, and agrees as follows: (1) Insured has received a copy of this Agreement and has authorized this transaction, Insured's signature is genuine, and the cash down payment has been received from Insured, (2) the information contained in the Schedule of Policies including the premium amount is correct and accurately reflects the necessary coverage, (3) the policies listed in the Schedule of Policies (a) are in full force and effect, (b) are cancellable by Insured or LENDER (or its successors or assigns), (c) will generate unearned premiums which will be computed on the standard short rate or pro rata basis, and (d) do not contain any provisions which affect the standard short rate or pro rata premium computation, including but not limited to direct company bill, audit, reporting form, retrospective rating, or minimum or fully earned premium, (4) the Agent or Broker is either the insurer's authorized policy issuing agent or the broker placing the coverage directly with the insurer, except where the name of the Issuing Agent or General Agent is listed in the Schedule of Policies, (5) to the best of the Agent or Broker's knowledge, there are no bankruptcy, receivership, or insolvency proceedings affecting Insured, (6) Agent or Broker will hold harmless and indemnify LENDER and its successors and assigns against any loss or expense (including attorney's fees, court costs, and other costs) incurred by LENDER and resulting from Agent or Broker's violations of these Representations and Warranties or from Agent or Broker's errors, omissions, or inaccuracies in preparing this Agreement, (7) Agent or Broker will (a) hold in trust for LENDER any payments made or credited to Insured through or to Agent or Broker by the insurance companies or LENDER, and (b) pay these monies and the unearned commissions to LENDER upon demand to satisfy the outstanding indebtedness under this Agreement, and (8) to fully and timely assist with all payroll audits.

NC License #482.  CA License #1850.  VA License #PF146.  California Borrowers: **FOR INFORMATION CONTACT THE DEPARTMENT OF FINANCIAL INSTITUTIONS, STATE OF CALIFORNIA**

FIF0216P

**SCHEDULE OF POLICIES**

Insured:  T3 Motion, Inc.
Quote #: 10463925

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| 012771042 | C00662-NATIONAL UNION FIRE INS CO PA<br>[CX:0]   [PR] | D&O | 12 | 03/04/2017<br>ERN TXS/FEES<br>FIN TXS/FEES | 165,222.00<br>0.00<br>0.00 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION TO USE PROPERTY OF THE ESTATE TO PRESERVE ESTATE'S INTEREST IN D&O INSURANCE POLICY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF TODD A. FREALY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 21, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Todd A Frealy     taf@lnbrb.com**
- **Todd A. Frealy (TR)     taftrustee@lnbyb.com, tfrealy@ecf.epiqsystems.com**
- **Monica Y Kim     myk@lnbrb.com, myk@ecf.inforuptcy.com**
- **Lewis R Landau    Lew@Landaunet.com**
- **Kenneth T Law    ken@bbslaw.com**
- **Albert T Liou     aliou@lkpgl.com, fcastro@lkpgl.com**
- **Kerri A Lyman     klyman@irell.com**
- **Juliet Y Oh     jyo@lnbrb.com, jyo@lnbrb.com**
- **Aram Ordubegian     ordubegian.aram@arentfox.com**
- **Carmela Pagay     ctp@lnbyb.com**
- **Thomas J Polis     tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com**
- **William B Skinner     will@skinneresq.com**
- **Mohammad Tehrani    Mohammad.V.Tehrani@usdoj.gov**
- **United States Trustee (RS)     ustpregion16.rs.ecf@usdoj.gov**

**2.  SERVED BY UNITED STATES MAIL**: On **December 21, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 21, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Overnight Mail***
Hon. Scott H. Yun
United States Bankruptcy Court
3420 Twelfth Street, Suite 345 / Courtroom 302
Riverside, CA 92501-3819

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 21, 2017 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                  **F 9013-3.1.PROOF.SERVICE**

Label Matrix for local noticing
0973-6
Case 6:17-bk-14082-SY
Central District of California
Riverside
Fri Oct 20 18:27:24 PDT 2017

Avon Tyres
4651 Prosper Dr
Stow, OH 44224

Lender Collections LLC
112 North Curry Street
Carson City, NV 89703-4934

United Parcel Service, Inc.
Bialson, Bergen & Schwab
c/o Lawrence Schwab/Kenneth Law
633 Menlo Ave.
Suite 100
Menlo Park, CA 94025-4711

AT&T
208 S. Akard St.
Dallas, TX 75202-4206

AT&T Corp
% AT&T Services, Inc
Karen A. Cavagnaro - Lead Paralegal
One AT&T Way, Room 3A104
Bedminster, NJ 07921-2693

Airgas
1961 S Santa Fe Ave
Los Angeles, CA 90021-2917

Alltrax
PO Box 179
Wilderville, OR 97543-0179

American Eagle Wheel Coporation
5780 Soestern Ct.
Chino, CA 91710-7020

American Electronic Resource Inc.
3505 Cadillac Ave # A
Costa Mesa, CA 92626-1464

American Express Travel Related Services Com
Inc.
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

American Made
8727 Utica Ave.
Rancho Cucamonga, CA 91730-5100

Anne H. Greenfield, Esq.
8502 E Chapman Ave # 139
Orange, CA 92869-2461

Avaya Financial Services
4655 Great America Parkway
Santa Clara, CA 95054-1233

Avnet Electronics Marketing
2211 South 47th Street
Phoenix, AZ 85034-6403

Avon Tyres
4600 Prosper Drive
Stow, OH 44224-1063

Axis US
725 S Figueroa St # 2250
Los Angeles, CA 90017-5452

Axis US
725 S. FIgueroa St. #2250
Los Angeles, CA 90017-5452

Bao Dong Wang
30-501 QiXiangTai Rd
HeXi Qu
Tianjin China
CHINA

Barney & Barney
1 Polaris, Suite 300
Aliso Viejo, CA 92656-5358

Beyond Century
21660 E. Copley Dr., Suite 268
Diamond Bar, CA 91765-4173

Bisco Industries
1500 North Lakeview Ave.
Anaheim, CA 92807-1819

Blakely, Sokoloff, Taylor & Zafman
3200 Park Center Drive, Suite 700
Costa Mesa, CA 92626-7149

Bloomfield Group
24532 Quintana Drive
Mission Viejo, CA 92691-5010

Business Wire
101 California Street, 20th Floor
San Francisco, CA 94111-5845

CR&R Incorporated
11292 Western Avenue
PO Box 125
Stanton, CA 90680-0125

California Department of Tax and Fee Admin/S
PO Box 942879
Sacramento CA 94279-0055

Campagna's Concepts & Composites, I
5702 Rainbow Hill Rd
Agoura Hills, CA 91301-1425

Carlisle Transportation Products
1990 S Vintage Ave
Ontario, CA 91761-2819

Catalina Group
P.O. Box 661506
Arcadia, CA 91066-1506

Century Spring Corp.
5959 Triumph St
Los Angeles, CA 90040-1609

Chaser Technologies, Inc.
PO Box 92917
City of Industry, CA 91715-2917

Chemtrec
2900 Fairview Park Dr
Falls Church, VA 22042-4513

ChunMin Zhang
23-5 BeiChen Qu
Tianjin China
CHINA

Clear Sky Law Group
2173 Salk Avenue, Suite 250
Carlsbad, CA 92008-7383

Clear Sky Law Group PC
1300 Clay St Ste 600
Oakland CA 94612-1427

Coast Machining Specialist Corp.
7125 Fenwick Ln # O
Westminster, CA 92683-5239

Component Center
11208 Young River Ave
Fountain Valley, CA 92708-4109

Cordero Charitable Remainder Trust
P.O. Box 6240
Stateline, NV 89449-6240

Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808-1646

Custom Carriages
18754 East Colonial Drive
Orlando, FL 32820-3000

Damion Hickman Design Inc.
26080 Towne Centre Drive
Foothill Ranch, CA 92610-3441

David Fausco
21411 Countryside Drive
Lake Forest CA 92630-6556

David Fusco
21411 Countryside Dr.
Lake Forest, CA 92630-6556

Daylight Transport, LLC
3200 S Hooper Ave
Los Angeles, CA 90011-2160

Department of the Treasury
Internal Revenue Service
Centralized Insolvency Operation
P.O. Box 7346
Philadelphia, PA 19101-7346

Douglas M Rodgers
11131 Dunning St
Santa Fe Springs CA 90670-3529

E.R.S. Security Alarm System, Inc.
4538 Santa Anita Ave
El Monte, CA 91731-1318

EFax
6922 Hollywood Blvd. 5th Floor
Los Angeles, CA 90028-6125

EVlithium Limited
RM 1618B 16/F Ho King
Comm CTR 2-16 Fa Yuen St.
Mongkok Kln
HONG KONG

Elena Chan
229 Santa Cruz Road
Arcadia, CA 91007-3031

Epic Freight Solutions
15901 Hawthorne Blvd
Lawndale, CA 90260-2655

Errol Higgins
16 Hughes Street, Suite C105
Irvine, CA 92618-1924

Event Video
23520 Arminta St.
Canoga Park, CA 91304-5803

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

FedEx
3965 Airways Blvd
Module G, 3rd Floor
Memphis, TN 38116-5017

Feng Shun Holdings Limited
Bldg 1602 Honghuajiayuan 108
Beiyuan Rd., Chaoyang District
Beijing
CHINA

Feng Xiao
CuiGexiang County, Nanying Road
ChaoYang District
Floor 3, No.2
Beijing, China

Flat Top Carts
966 Shulman Ave
Santa Clara, CA 95050-2822

OXFORD MOTOR CREDIT COMPANY
P O BOX 62180
COLORADO SPRINGS CO 80962-2180

Ford Motor Credit Company LLC
P.O. Box 552679
Detroit, MI 48255-2679


Forward SEO
1324 Lexington Ave #328
New York, NY 10128-1145

Franchise Tax Board
Bankruptcy Unit
P.O. Box 2952
Sacramento, CA 95812-2952

Franchise Tax Board
Bankrutpcy Unit
P.O. Box 2952
Sacramento, CA 95812-2952


GD Signs
711 W. 17th St. STE G3
Costa Mesa, CA 92627-4347

GG Capital & Investment Corporation
123 West Nye Ln., Ste. 129
Carson City, NV 89706-0838

Global Logistical Connection
475 W Manville St
Compton, CA 90220-5619


Globaltranz Enterprises, Inc.
7350 N Dobson Rd., Ste. 130
Scottsdale, AZ 85256-2711

GlobeNewswire
P.O.Box 8500
Philadelphia, PA 19178-8500

Hai Xu Yuan
1907, HongQi Rd
NanKai District
Tianjin, China
CHINA


Hartford Insurance
690 Asylum Avenue
Hartford, CT 06155-0002

Hasler
478 Wheelers Farms Rd.
Milford, CT 06461-9105

Have Inc.
309 Power Avenue
Hudson, NY 12534-2448


Home Tech Solutions, Inc.
10600 S. De Anza Blvd
Cupertino, CA 95014-4450

HongYuanDaCheng Ltd.
16-2-505 XinJiaYuan Rd
JinNan Qu
Tianjin, China
CHINA

HongYuanDaCheng Ltd.
16-2-505 XinJiaYuan Rd
JinNanQu
Tianjin China
CHINA


Howard Isaacs
5844 Graves Ave
Encino, CA 91316-1443

Illinois Lock Company
301 W. Hintz Road
Wheeling, IL 60090-5700

Illinois Pulley & Gear, Inc.
611 Lunt Ave # C
Schaumburg, IL 60193-4410


Image Sensing Systems
500 Spruce Tree Centre
1600 University Ave. West
Saint Paul, MN 55104-3893

Industrial Metal Supply
8300 San Fernando Rd
Sun Valley, CA 91352-3222

Jose Fernandez
206 S. Sullivan St., #10
Santa Ana, CA 92704-1638


Joseph F. Whitts, Jr. (Jay)
4817 Fox Chase Road
Greensboro, NC 27410-2517

Kelly Services
999 West Big Beaver Road
Troy, MI 48084-4716

Kelly Services Inc
999 West Big Beaver
Troy MI 48084-4716


Kenda Tires
7095 Americana Parkway
Reynoldsburg, OH 43068-4118

Kimball Midwest
4800 Roberts Road
Columbus, OH 43228-9791

Konica Minolta Business Solutions
100 Williams Drive
Ramsey, NJ 07446-2907

LKP Global Law, LLP
1901 Avenue of the Stars #480
Los Angeles, CA 90067-6006

La Habra Welding Supplies, I
2121 E Lambert Rd Suite 302
La Habra, CA 90631-5768

Law Offices of Eric D. Morton
2173 Salk Ave # 250
Carlsbad, CA 92008-7383


Lender Collections LLC
216 1st Avenue., Suite 333
Seattle, WA 98104-2534

Lender Collections LLC
Irell & Manella LLP Attn: J M Reisner
840 Newport Center Drive Suite 400
Newport Beach CA 92660-6396

Lender Collections LLC
c/o Jeffrey Reisner
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6396


Lightning Bolt Inc.
3109 N. Cascade Ave
Colorado Springs, CO 80907-5185

Line X of South Los Angeles
5901 Firestone Blvd
South Gate, CA 90280-3707

Luckybike.com
3620 SW US Hwy 40
Blue Springs, MO 64015-4500


Lynmar Distribution
1000 Progress Dr.
New Lisbon, WI 53950-1531

Marketwired
100 N. Sepulveda Boulevard, Suite 3
El Segundo, CA 90245-5649

McDonald
c/o Tiger Group
60 State Street, 11th Floor
Boston, MA 02109-1800


McMaster Carr Supply Co.
9630 Norwalk Blvd
Santa Fe Springs, CA 90670-2954

Mi 'Michael' Zhang
5181 Edison Ave.
Chino, CA 91710-5718

Mi Zhang
Room 504
Building No 16 Tianyurongchang Cre
ShuangGang Town Jinnan District
Tianjin CHINA


Mi Zhang
Room504
Building No. 16 Tianyurongchang Cre
ShuangGang Town, Jinnan District
Tianjin, CHINA

Mitchell Silberberg & Knupp LLP
11377 W. Olympic Blvd.
Los Angeles, CA 90064-1683

Mouser Electronics
1000 North Main Street
Mansfield, TX 76063-1514


National Union Fire Insurance Company of Pit
Kevin J. Larner, Authorized Representati
80 Pine Street, 13th Floor
New York, NY 10005-1734

Nawa Media
4430 E Miraloma Ave., Suite C
Anaheim, CA 92807-1840

Newark In One
4801 N Ravenswood Ave.
Chicago, IL 60640-4478


Noel Cherowbrier
5181 Edison Ave.
Chino, CA 91710-5718

Noel Cherowbrier
970 Challenger St.
Chino, CA 91710

PTS Services
3511 S. Eastern Ave
Las Vegas, NV 89169-3314


Pacific Bell Telephone Company
% AT&T Services, Inc
Karen A. Cavagnaro - Lead Paralegal
One AT&T Way, Room 3A104
Bedminster, NJ 07921-2693

Pacific Safeway LP
dba Safeway Industries Park
1640 S. Sepulveda Blvd., Suite 214
Los Angeles, CA 90025-7535

Pacific Wire & Cable
1228 Village Way Ste. F
Santa Ana, CA 92705-4747


Pinpoint Electronics
3045 Haven Blvd # H133
Riverside, CA 92501

Qingdao Zhenghua Hand Truck Co LTD
Yinzhu Town Jiaonan
Qingdao China
CHINA

R&I Industries, Inc.
1876 S Taylor Pl
Ontario, CA 91761-5556

R&J Components
360 Rabro Dr
Hauppauge, NY 11788-4226

Reliance Plating & Coating, Inc.
1151 E Ash Ave
Fullerton, CA 92831-5017

Remington Pure
28165 Ave Crocker
Valencia, CA 91355-3440

Richardson & Patel
1100 Glendon Ave
Los Angeles, CA 90024-3525

Ricoh USA Inc
1055 W 7th St #2100
Los Angeles, CA 90017-2676

SBA Tek, Inc.
2010 W Chestnut Ave
Santa Ana, CA 92703-4342

Salesforce.com Inc
Bialson Bergen & Schwab
633 Menlo Ave Ste 100
Menlo Park CA 94025-4711

Salesforce.com Inc.
One Market, Suite 300
San Francisco, CA 94105-5188

Securities Transfer Corporation
2901 N Dallas Parkway, Suite 380
Plano, TX 75093-5990

Shop-Pro Equipment Inc
10706 S 147th St
Omaha, NE 68138-3945

Simon & Edward, LLP
3230 Fallow Field Drive
Diamond Bar, CA 91765-3479

Simon & Partners
Isle of Lucaya, Freeport
Grand Bahamas, Bahamas
BAHAMAS

Sonitrol Gold Coast
19 Spectrum Pointe Dr Ste 601
Lake Forest, CA 92630-2278

Spam Soap
3193 Red Hill
Costa Mesa, CA 92626-3432

Standard & Poor's Financial Service
55 Water Street
New York, NY 10041-0003

TAAD LLP
20955 Pathfinder Rd., Suite 100
Diamond Bar, CA 91765-4029

Team Worldwide
629 W Broadway
Winnsboro, TX 75494-2059

TeamLogic IT
25909 Pala #190
Mission Viejo, CA 92691-7948

Tube Service Co
9351 Norwalk Blvd
Santa Fe Springs, CA 90670-2974

UPS
55 Glenlake Parkway NE
Atlanta, GA 30328-3474

UPS Supply Chain Solutions
12380 Morris Road
Alpharetta, GA 30005-4177

US Securities & Exchange Commission
100 F Street NE
Washington DC 20549-0213

US Securities & Exchange Commission
444 South Flower Street Suite 900
Los Angeles CA 90071-2934

United States Trustee (RS)
3801 University Avenue, Suite 720
Riverside, CA 92501-3255

W TSUMPES
C/O J DELIKANAKIS SNELL & WILMER
3883 HOWARD HUGHES PKWY #1100
LAS VEGAS NV 89169-0965

Walmart
702 Sw 8th St
Bentonville, AR 72716-6299

Wayne Mitchell
708 Elizabeth St.
Key West, FL 33040-6402

Worldwide Express OC
4 Executive Cir Ste 180
Irvine, CA 92614-6790

YRC Freight
P.O. Box 100129
Pasadena, CA 91189-0129

Aram Ordubegian
Arent Fox LLP
555 W 5th St 48th Fl
Los Angeles, CA 90013-1065

FIRST Insurance Funding
Attn: Eric Steinfeld
450 Skokie Blvd., Ste. 1000
Northbrook, IL 60062

Jeffrey M. Reisner
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6396

M Douglas Flahaut
Arent Fox, LLP
555 W Fifth St
48th fl
Los Angeles, CA 90013-1065